**UNITED STATES of America, Plaintiff,**

v.

**ALCAN ALUMINUM CORPORATION, Defendant.**

**Civ. A. No. 89–CV 1657.**

United States District Court, M.D. Pennsylvania.

June 28, 1995.

---

Margaret Kane Harrington, Land and Natural Resources Div., Environmental Defense Section, U.S. Dept. of Justice, Michael D. McIntyre, Environmental Enforcement Section, U.S. Dept. of Justice, Richard B. Stewart, Asst. Atty. Gen., Land and Natural Resources Div., U.S. Dept. of Justice, Washington, DC, Robert R. Long, Jr., Asst. U.S. Atty., Lewisburg, PA, John A. Morano, Jr., U.S. Atty's Office, Scranton, PA, Michael J. McNulty, Dept. of Justice, Environment & Natural Resource Div., Environmental Enforcement Section, Washington, DC, for plaintiff.

Gerry J. Elman, Frederic M. Wilf, Elman Associates, P.C., Media, PA, Lawrence A. Salibra, II, Cleveland, OH, for defendant.

### *MEMORANDUM*

VANASKIE, District Judge.

This cost recovery action by the United States (the "Government") under Section 107(a) of the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. § 9607(a), is before this Court on remand from the United States Court of Appeals for the Third Circuit. This Court was directed to determine whether defendant Alcan Aluminum Corporation ("Alcan") can avoid or limit liability that otherwise may be imposed as a result of the fact that its used oil emulsion had been commingled with other oily wastes containing hazardous substances which discharged from a mine tunnel into the Susquehanna River in 1985 in the wake of Hurricane Gloria. *See United States v. Alcan Aluminum Corp.*, 964 F.2d 252, 270–71 (3rd Cir.1992) ("Alcan–Butler"). Our Court of Appeals indicated that if Alcan established that its used "emulsion did not or could not, *when mixed with other hazardous wastes*, contribute to the release and the resultant response costs, then Alcan should not be responsible for *any* response costs." *Id.* at 270 (emphasis in original). In remanding this matter, the Third Circuit plainly contemplated that an evidentiary hearing would be conducted on the "intensely factual" issue of "whether there is a reasonable basis for limiting Alcan's liability based on its personal contribution to the harm to the Susquehanna River." *Id.* at 269.

Contrary to the expectations of the Third Circuit that an evidentiary hearing would be conducted on such complex matters as the relative toxicity, migratory potential, and synergistic capacity of the hazardous waste at issue, Alcan has reiterated its previously articulated argument that, as a matter of law, it cannot be held liable for *any* of the costs incurred by the Government in responding to the release of oily wastes into the Susquehanna River. (Docket Entry 135.) The crux of Alcan's argument is that those constituents of its oily waste that are defined to be "hazardous substances" under CERCLA (metals such as lead, cadmium, chromium, copper and zinc) are present in the used emulsion at concentrations below the naturally-occurring levels of those metals so that the presence of those metals in its used emulsion could not have caused any environmental harm. Alcan also asserts that liability may not be imposed against it because the Environmental Protection Agency ("EPA") did not direct any response efforts to the removal of metals following the 1985 discharge. Alcan acknowledges that the arguments presented in its summary judgment motion are very similar to arguments it pursued before the Third Circuit, *i.e.*, that its used emulsion did not cause any injury to the Susquehanna River because " 'below ambient levels of any substance can never cause or contribute to a release or response costs.' " *Id.* at 270.

The Government has also moved for summary judgment on the remanded issue. (Docket Entry 131.) The gist of the government's argument is that this Court's inquiry is not to be restricted to the below ambient level of metals in the emulsion. According to the Government, "it was the emulsion as a whole, not just the individual constituents in the emulsion, which contributed to the harm...." (Brief in Support of Government's Summary Judgment Motion (Docket Entry 131) at 35.) Asserting that Alcan has failed to present any evidence on matters germane to a determination that its liability should not be joint and several, such as the percentage of the volume of total waste represented by Alcan's waste, the relative toxicity of Alcan's waste compared to other con-

stituents of the oily mass, etc., the government maintains that it is entitled to summary judgment.

It is the law of this case that the addition of metals below ambient levels to Alcan's emulsion during the manufacturing processes brings the *used emulsion* within CERCLA's purview. 964 F.2d at 266–67. In assessing relative responsibility for environmental harm, therefore, the focus must be on the emulsion as a whole, and not its individual constituents. Because there is no evidence that the used emulsion was environmentally safe, and in view of Alcan's failure to offer any other evidence on the question of whether there is a reasonable basis for determining the contribution of its used emulsion to the pollution of the Susquehanna River, Alcan's summary judgment motion will be denied and the Government's summary judgment motion will be granted.[1]

## I.

### *FACTS AND PROCEDURAL HISTORY*
#### A. *STATEMENT OF THE FACTS*

The factual background of this case is set forth in the Third Circuit's Opinion, 964 F.2d at 255–57, and familiarity with that Opinion is assumed. It is sufficient for purposes of this Memorandum to recite only the following salient facts:

● In its manufacturing processes, Alcan used an emulsion consisting of 95% deionized water and 5% mineral oil.[2]

● During the manufacturing process, trace levels of copper, chromium, cadmium, zinc and lead were added to the emulsion.[3]

● Copper, chromium, cadmium, lead and zinc are hazardous substances under CERCLA. 964 F.2d at 256.

● The level of concentration of these hazardous substances in Alcan's used emulsion was below the naturally-occurring, or ambient, levels of these hazardous substances.

● In the late 1970's, approximately 2 million gallons of oily wastes containing hazardous substances were dumped down an air shaft or "borehole" leading to a network of coal mines and related tunnels, caverns, pools and waterways bordering the east bank of the Susquehanna River in Pittston, Pennsylvania. (Hereinafter referred to as the "Site.") The mine workings are drained by the Butler Tunnel, which discharges directly into the Susquehanna River.

● From mid–1978 to late 1979, approximately 32,500 to 37,500 gallons of Alcan's used emulsion was dumped down the borehole leading to the mine workings serviced by the Butler Tunnel.[4]

● In September of 1985, in the wake of Hurricane Gloria, approximately 100,000 gallons of oily waste contaminated with hazardous substances were discharged from the Butler Tunnel into the Susquehanna River.

● EPA's response costs in addressing this release totalled $1,302,290.18. Response actions included " 'containing an oily material on the river through the use of absorbent booms; immediately removing and disposing of 161,000 pounds (over 80 tons) of oil and chemical-soaked debris and soil, monitoring, sampling and analysis of air and water, and conducting hydrogeologic studies.' " 964 F.2d at 256–57.

---

1. Alcan has also sought to avoid liability on the basis of the "act of God" defense. *See* 42 U.S.C. § 9607(b)(1). Alcan contends that the oily waste was flushed into the Susquehanna River by torrential rains of Hurricane Gloria. Because it is clear that Alcan cannot demonstrate that the release in question was caused solely by Hurricane Gloria, Alcan's summary judgment motion on the "act of God" defense will also be denied.

2. "An emulsion is composed of two immiscible liquids." Lee, et al., *General and Organic Chemistry* (1971) at 530. In this case, the mineral oil and deionized water are immiscible, that is, they are insoluble in each other. *Id.* at 260.

3. *See*, paragraph 9 of the Government's Statement of Material Facts (Docket Entry 132), and Alcan's response thereto. (Docket Entry 149.)

4. The Government contends that as much as 120,000 gallons of Alcan's used emulsion was dumped into the borehole, but Alcan disputes this assertion. For purposes of the parties' summary judgment motions, it will be assumed that the amount of Alcan's waste poured into the borehole was that set forth in the text. This volume of waste was also relied upon by the Third Circuit in its opinion. *See*, 964 F.2d at 256 and 270 n. 29.

- Alcan's used emulsion was commingled in the waste materials discharged into the Susquehanna River in September of 1985.[5]

- The waste oils removed from the Susquehanna River contained cadmium, chromium, copper, lead and zinc.[6]

## B. *PROCEDURAL HISTORY*

In November, 1989, the Government brought this action against 20 defendants who purportedly generated the waste materials dumped into the borehole and which discharged into the Susquehanna River. Included among the defendants was Alcan. The government settled with 19 of the defendants, and then moved for summary judgment against Alcan, the lone non-settling defendant. The government sought a determination that Alcan was jointly and severally liable for the remaining unreimbursed response costs of $473,790.18, or more than 35% of the total response costs of $1,300,000. Alcan cross moved for summary judgment, contending that its waste emulsion was not a "hazardous substance" as defined by CERCLA because levels of copper, cadmium, chromium, lead and zinc were below naturally-occurring levels.

Adopting the reasoning set forth in *United States v. Alcan Aluminum Corp.*, 755 F.Supp. 531 (N.D.N.Y.1991), *aff'd in part and rev'd in part*, 990 F.2d 711 (2nd Cir. 1993), this Court found that Alcan's used emulsion was a hazardous substance under CERCLA and that Alcan was jointly and severally liable for the Government's unreimbursed response costs because the environmental harm caused by the commingled wastes was indivisible. Accordingly, judgment was entered against Alcan for $473,-790.18.

On appeal, the Third Circuit affirmed this Court's holding that there is no threshold quantitative requirement for a waste to be defined as a "hazardous substance." Thus, because Alcan's used emulsion admittedly contained elements that fall within the definition of "hazardous substances" in CERCLA, *see* 42 U.S.C. § 9601(14), the presence of its used emulsion in the commingled mass of waste exposed Alcan to liability. In this regard, the appellate court rejected Alcan's argument that the Government must prove that Alcan's oily waste caused or contributed to the "release" or the government's incurrence of response costs.[7] Instead, as our Court of Appeals explained, "the Government must simply prove that the defendant's hazardous substances were deposited at the site from which there was a release and that the *release* caused the incurrence of response costs." 964 F.2d at 266 (emphasis in original).

The Third Circuit also rejected Alcan's contention that its used emulsion was excluded from CERCLA liability because it constituted "petroleum," which is exempted from the definition of hazardous substances in 42 U.S.C. § 9601(14). Specifically, the court ruled that because Alcan's manufacturing processes added hazardous substances such as cadmium, chromium, copper, lead and zinc to the emulsion, albeit at below-ambient levels, the petroleum exclusion was inapplicable. In this regard, the court noted that "the relevant legislative history ... indicates that the exclusion was intended for oil spills, not for releases of oil which has become infused with hazardous substances through use." 964 F.2d at 267.

Responding to Alcan's assertion that extending CERCLA to materials that contained only ambient levels of hazardous substances would subject parties to joint and several liability even if the materials posed no threat to the environment, the Third Circuit held that the divisibility of harm rule set forth in Section 433A of the Restatement (Second) of Torts was applicable. The court explained that a party could avoid or limit liability by showing that its material could not cause any harm or by establishing a

---

5.  Paragraph 49 of the Government's Statement of Material Facts (Docket Entry 132), and Alcan's response thereto. (Docket Entry 149.)

6.  Paragraph 43 of the Government's Statement of Material Facts (Docket Entry 132), and Alcan's response thereto. (Docket Entry 149.)

7.  A "release" includes the discharging or dumping into the environment of any hazardous substance. 42 U.S.C. § 9601(22).

reasonable basis for apportioning liability. 964 F.2d at 267–71.

Alcan urged that there was no need for an evidentiary hearing on the divisibility of harm issue, asserting that in this case "not only is the harm divisible, but [Alcan's] relevant contribution to the injury to the Susquehanna River is zero." *Id.* at 269–70. The Third Circuit, however, determined that it was not the appropriate forum to decide this issue in the first instance, observing that "whether Alcan is correct that its emulsion poses no threat to the environment, even when added to other hazardous substances, should be thoroughly investigated on remand in the factual hearing concerning the divisibility of harm." *Id.* at 264 n. 20. Thus, this matter was remanded to reconsider "Alcan's effort to avoid liability otherwise established." *Id.* at 269.

Following remand, the parties engaged in some discovery. Both the Government and Alcan then moved for summary judgment. Following the filing of briefs, oral argument was conducted. This matter is ripe for disposition.[8]

## II.

## DISCUSSION

### A. *Summary Judgment Standards*

Summary judgment should be granted when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A fact is "material" if proof of its existence or non-existence might affect the outcome of the suit under the applicable law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). "Facts that could alter the outcome are material facts." *Charlton v. Paramus Board of Education,* 25 F.3d 194, 197 (3rd Cir.), *cert. denied,* — U.S. ——, 115 S.Ct. 590, 130 L.Ed.2d 503 (1994). "Summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248, 106 S.Ct.

at 2510. There is no issue for trial unless sufficient evidence favors the nonmoving party so that a jury could return a verdict for that party. *Id.,* at 249, 106 S.Ct. at 2510–11. Rule 56 requires the entry of summary judgment where a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

### B. *Alcan's Summary Judgment Motion on the Divisibility of Harm Issue*

■ The crux of the parties' dispute pertains to whether Alcan's potential contribution to the environmental harm to the Susquehanna River is limited to an assessment of the impact of the trace-level metals found in its used emulsion or should encompass the environmental significance of the used emulsion as a whole. Alcan insists that its potential liability can only be determined in the context of those constituents of its used emulsion that are defined to be "hazardous substances" and which render inapplicable CERCLA's petroleum exclusion—the heavy metals added in trace levels to its emulsion as a consequence of the manufacturing process. According to Alcan, the below background levels of the metal constituents of its used emulsion could not have caused an environmental problem relating to metals at the Site. Alcan also asserts that the Government's response actions were unrelated to the presence of metals. Thus, argues Alcan, it cannot be held liable for any of the Government's response costs.

The Government responds by contending that the absence of environmental problems and response actions related to metals at the Site are immaterial. According to the Government, "it was the emulsion as a whole, not just the individual constituents in the emulsion, which contributed to the harm at the Site." (Brief in support of the Government's Summary Judgment Motion (Docket Entry 131) at 35.)

---

8. The transcript of the oral argument ("Tr.") is in   the record as Docket Entry 158.

During oral argument, Alcan conceded that it cannot prevail on its summary judgment motion if the hazardous substance of concern is the used emulsion itself. (Tr. at 10.) Thus, the dispositive question here is whether the focus of the divisibility of harm issue should be on the emulsion as a whole or should be limited to its constituents.[9]

Alcan draws support for its position from the concluding paragraph of the Third Circuit Opinion, in which it is stated that "if Alcan can establish that the *hazardous substances in its emulsion* could not, when added to other hazardous substances, have caused or contributed to the release or the resultant response costs, then it should not be liable for any of the response costs." 964 F.2d at 271 (emphasis added). But elsewhere in its Opinion the Court of Appeals indicated that the inquiry should be directed to whether "the *emulsion* did not or could not, *when mixed with other hazardous wastes,* contribute to the release and resultant response costs. . . ." *Id.* at 270 (emphasis in original and added). The court also stated that it would be Alcan's burden to show that "its *emulsion* poses no threat to the environment, even when added to other hazardous substances. . . ." 964 F.2d at 264 n. 20. Thus, the question of whether this Court's inquiry should be limited to the "hazardous substances" found in the used emulsion is not answered by the Third Circuit opinion.

Essentially, Alcan is arguing that even if its used emulsion, as a whole, is environmentally harmful, it should not be subject to any liability because the constituents that remove the used emulsion from CERCLA's petroleum exclusion could not be the cause for that environmental harm. This effort to dissect its waste material into components regulated by CERCLA and those not regulated by CERCLA is not consistent with the remedial purposes sought to be advanced by this legislation.[10] Furthermore, a holding that the dumping of a petroleum-based liquid that falls outside CERCLA's petroleum exclusion because of the addition of heavy metals in the manufacturing process is not subject to CERCLA liability because the metals did not cause any environmental harm cannot be reconciled with "the legislative history which indicates that the [petroleum] exclusion was intended for oil spills, not for releases of oil which has become infused with hazardous substances through use." 964 F.2d at 267. As the Government pointed out during oral argument:

[O]nce you add metals or any other foreign substance to the petroleum, if it doesn't exist in the state Congress and EPA recognize as the regulated state under other statutes, then it's a hazardous substance. . . . That's what makes it a hazardous substance.

And it doesn't mean that you're allowed to then focus on each of the individual constituents or any threshold level with respect to those constituents. It means that the entire emulsion oil is a hazardous sub-

9. Alcan's exclusive reliance on arguments pertaining to the constituents of its emulsion that subject Alcan to CERCLA liability is evidenced by its Statement of Material Facts, which on the divisibility of harm issue consists entirely of the following five statements:

    1. The addition of below background metal compounds cannot cause or contribute to a release of metal compounds.

    2. There was no release of metal compounds from the Butler Mine Tunnel.

    3. There was no environmental problem relating to metals at the Butler Tunnel Mine Site.

    4. There were no response efforts directed to remediation of metals at the Site, the constituents that rendered the Alcan emulsion a CERCLA "hazardous substance."

    5. The response actions at the Butler Mine Tunnel Site were related to remediation of an oil spill, and were unrelated to metals or other hazardous substances.

    The Government, while disputing most of these factual assertions, maintains that all the assertions are immaterial. For purposes of considering Alcan's Summary Judgment Motion, its factual assertions have been accepted as true. Because the assertions do not affect the outcome of this case, they are not material. *Charlton,* 25 F.3d at 197. If this Court's inquiry were to be limited to the constituents of the emulsion that are classified as "hazardous substances," it would be necessary to conduct an evidentiary hearing to resolve the disputes with respect to those assertions.

10. CERCLA, of course, is to "be construed liberally to effectuate its goals." *Alcan–Butler,* 964 F.2d at 258.

stance. [Tr. at 31–32.] [11]

In short, the environmental harm posed by the medium that contains CERCLA-defined "hazardous substances" cannot be ignored. If the medium, with its "hazardous substance" constituents at ambient or below ambient levels, is environmental benign, even when mixed with other hazardous wastes, then liability should not be imposed. Thus, for example, if Alcan had generated federally-approved drinking water that was dumped into the borehole it would not be subject to liability because that drinking water, even though it contains naturally-occurring levels of chromium and other metals, could not have caused any environmental harm. [12]

In this case, Alcan has presented neither evidence nor argument that its used emulsion is environmentally benign. While the constituents of the used emulsion which bring it within CERCLA's ambit may not have contributed to the harm, Alcan has not contended that its used emulsion itself was harmless.

In this regard, Alcan's analogy to commingling sand (hazardous because it is an abrasive) and an explosive is inapt. The logical consequence of the Government's argument is *not* the imposition of joint and several liability on the generator of an inert substance classified as hazardous because of its abrasive characteristics (sand) merely because the sand was commingled with another substance classified as hazardous which must

be removed from the commingled mass. Instead, under the analogy hypothesized by Alcan, liability would not be imposed on the generator of sand because no environmental harm was posed by that material. Indeed, it is likely that sand would contain naturally occurring levels of metals such as chromium, cadmium and zinc, and yet liability would not be imposed because the material, as a whole, did not pose any environmental threat.

In this case, if Alcan had presented evidence that its used emulsion, when mixed with the other hazardous wastes that were commingled in the Butler Tunnel discharge, could not pose any harm to the environment, Alcan would be in the same position as the generator of the sand. The mere commingling of materials that have constituents classified as "hazardous substances" would not result in the imposition of liability.

Another way to consider the issue is to determine whether the discharge of only the used emulsion into the Susquehanna River would have caused environmental harm warranting some cleanup response. Alcan has not argued that it could dump thousands of gallons of its used emulsion into a river without posing a threat to the environment. Because Alcan's used emulsion falls within CERCLA's purview, the complete absence of evidence that the used emulsion itself is environmentally benign compels denial of Alcan's summary judgment motion. [13]

11. Support for this conclusion may be gleaned from the Second Circuit's decision reversing Judge McAvoy's ruling on which this Court had relied in granting summary judgment in favor of the Government in the first instance. *See United States v. Alcan Aluminum Corp.*, 990 F.2d 711 (2nd Cir.1993). Although the environmental harm at issue in the Second Circuit case is different from the environmental harm involved here, the material, Alcan's used emulsion, remains the same. The Second Circuit ruled that "Alcan may escape any liability for response costs if it either succeeds in proving that its *oil emulsion*, when mixed with other hazardous wastes, did not contribute to the release and the cleanup costs that followed, or contributed at most to only a divisible portion of the harm." *Id.* at 722 (emphasis added). Thus, the Second Circuit indicated that the focus of any effort to avoid liability must be on the emulsion itself, and not on the constituents of that emulsion.

12. As Alcan argues, " '[w]hen one adds two materials that have the same concentrations of an

element or compound, the net result is the *same* concentration.' " *Alcan–Butler*, 964 F.2d at 270 (emphasis in original). Thus, in the drinking water context, the medium for transport of the hazardous substances would not have increased the concentration of metals *and* would not *otherwise* pose a threat to the environment.

13. Clearly, this result does not mean that liability may be imposed on any party that has generated materials which include constituents that are classified as hazardous substances. But if the material, as a whole, is environmentally harmful, the fact that the material contains hazardous substances brings it within the ambit of CERCLA liability even though the threat to the environment is not posed by the components that are classified as hazardous substances. Thus, for example, if thousands of gallons of milk (otherwise a non-hazardous material) are dumped into a stream and that milk is harmful to the environment, then the fact that it contains elements or compounds classified as "hazardous substances"

In short, it is the law of this case that Alcan's used emulsion falls within CERCLA's broad reach. Because Alcan has not presented any evidence from which it may be inferred that its used emulsion, when mixed with the other hazardous wastes, did not pose any threat to the environment or cause environmental harm, its request that judgment be entered in its favor must be denied.

### C. *The Government's Summary Judgment Motion on the Divisibility of Harm Issue.*

■ Simply because Alcan's arguments to avoid all liability have been rejected does not mean that the Government is entitled to summary judgment. Moreover, the mere fact that Alcan's used emulsion was commingled with other hazardous wastes does not, by itself, warrant imposition of joint and several liability. As our Court of Appeals held, " 'commingled' " waste is not synonymous with " 'indivisible harm' ". 964 F.2d at 270 n. 29. *Accord, Cereghino v. Boeing Co.,* 873 F.Supp. 398, 402–03 (D.Or.1994).

But the Government's motion for summary judgment is not premised solely upon the commingling of hazardous waste. Instead, the Government asserts that it is entitled to summary judgment because Alcan has not presented *any* evidence on those matters germane to an apportionment of liability.

In remanding this matter, the Third Circuit directed that the divisibility of harm rule set forth in the *Restatement (Second) of Torts* should govern the determination of whether joint and several liability should be imposed. As the Court explained:

> Section 433A of the Restatement provides that, when two or more joint tortfeasors acting independently cause a distinct or single harm for which there is a reasonable basis for division according to the contribution of each, each is subject to liability only for the portion of the harm that the individual tortfeasor has caused. 964 F.2d at 268.

*Accord, Redwing Carriers, Inc. v. Saraland Apartments, Ltd.,* 875 F.Supp. 1545, 1568

(S.D.Ala.1995) The burden is on the defendant to "prove that there is a way to determine what portion of the 'harm' (i.e. the hazardous substances present at the facility and the response costs incurred in dealing with them) is fairly attributable to [the defendant], as opposed to other responsible parties." *United States v. Rohm and Haas Co.,* 2 F.3d 1265, 1280 (3rd Cir.1993). Consistent with the Third Circuit's approach, the Fifth Circuit has explained that "[i]f the expert testimony and other evidence establish a factual basis for making a reasonable estimate that will fairly apportion liability, joint and several liability should not be imposed in the absence of exceptional circumstances." *In re Bell Petroleum Services, Inc.,* 3 F.3d 889, 900 (5th Cir.1993). The "divisibility" inquiry is thus similar to the "contribution" inquiry in that the concern is the harm caused by the defendant. *Alcan–Butler,* 964 F.2d at 270 n. 29.

■ Where, as here, hazardous wastes are commingled, apportionment of liability must take into account "evidence disclosing the individual and interactive qualities of the substances deposited there." *United States v. Monsanto Co.,* 858 F.2d 160, 172 (4th Cir. 1988), *cert. denied,* 490 U.S. 1106, 109 S.Ct. 3156, 104 L.Ed.2d 1019 (1989). Among the matters to be considered are the "relative toxicity, migratory potential and synergistic capacity" of the various substances present. *Alcan–Butler,* 964 F.2d at 269. *Accord, United States v. Broderick Investment Co.,* 862 F.Supp. 272, 276 (D.Colo.1994). Generally speaking, an inquiry into apportionment of liability is "intensely factual." *Alcan–Butler,* 964 F.2d at 269. *Accord, United States v. Alcan Aluminum Corp.,* 990 F.2d 711, 722 (2nd Cir.1993.) Moreover, the burden on the defendant is "substantial." *Alcan–Butler,* 964 F.2d at 269.

The Government has moved for summary judgment in light of Alcan's failure to proffer any evidence on such matters as relative toxicity, migratory potential, and synergistic characteristics of the oily wastes dumped into the Butler Tunnel borehole. Alcan, for example, has not compared the chemical com-

under CERCLA may indeed make the generator of that milk liable for the costs incurred in re-

sponding to the release and resultant environmental harm.

position of its used emulsion to other wastes dumped into the borehole. It has not addressed the question of whether its used emulsion could have reacted with the other oily wastes under the circumstances present in the mine workings. Nor has it suggested the likely products of any chemical reactions. Instead, its entire argument on the joint and several liability issue is premised upon the contention that " 'its emulsion contains below ambient, ubiquitous, immobile and insoluble metal compounds similar to those naturally found in the soil at the Site and capable of causing no harm to the environment....' " (Brief in support of Government's Summary Judgment Motion (Docket Entry 131) at 33–34.) Alcan also asserts that, because metals were not targeted for remediation, "all of the issues which the Third Circuit stated should be addressed on remand such as the metals' ability to concentrate and cause a problem are irrelevant to this case." (Reply Brief in Support of Alcan's Summary Judgment Motion (Dkt.Entry 154) at 6.)

During oral argument, Alcan was questioned as to whether it intended to present evidence "concerning the toxicity and migratory potential and other factors related to its emulsion to support an argument of divisibility of harm or a reasonable basis for apportionment [of damages]." (Tr. at 20–21.) Alcan responded by asserting that "the evidence that we will present is [that the concentration level of metals] is less than background and it caused no harm...." (Tr. at 21.) Because the inquiry is not limited to metals in the emulsion, Alcan's failure to present evidence on these key issues is untenable.[14]

Alcan also did not present evidence or argument on the issue of whether apportionment of liability on a volumetric basis would be appropriate here. Evidence that the wastes of other generators deposited into the borehole were similar to Alcan's used emulsion could support an apportionment of liability on a volumetric basis. *Cf., Bell Petroleum Services*, 3 F.3d at 903–04 (apportionment of liability appropriate where there is a single harm attributable to essentially fungible wastes). As the Third Circuit observed, apportionment is common in cases of pollution of a stream by two or more parties.[15] But Alcan eschewed the opportunity to limit its liability to the ratio of its wastes to total wastes dumped into the borehole. Instead, Alcan pursued an "all or nothing" approach.

It was Alcan's burden to present facts sufficient to create a triable issue on apportionment of liability. Alcan's exclusive reliance on the fact that metals contained in its used emulsion were below ambient levels does not present a genuine dispute as to a material fact. Because Alcan has failed to present other evidence pertinent to the divisibility of harm inquiry, summary judgment in favor of the Government in the full amount of its unreimbursed response costs of $473,790.18, is warranted.[16]

---

**14.** Alcan acknowledged that the argument it was advancing was essentially the same as the argument it had made to the Third Circuit:

> THE COURT: Mr. Salibra, is the argument that you are making today much different than the argument you made to the Third Circuit when this was up on appeal?
>
> MR. SALIBRA: It is no different in substance and in science ... and, as you know, I advocated that they really need not go back to [this] Court to look at the science of it to understand it.
>
> My view is they felt it was a fact issue, and they just didn't want to deal with the fact issue, even if I was right. They were going to let that be made by the District Court. [Tr. at 36–37.]

**15.** In *Bell Petroleum Services*, 3 F.3d at 903, the Fifth Circuit recognized that "pollution of a stream may be treated as divisible in terms of degree, and [liability] apportioned among the defendants on the basis of evidence of the respective quantities of pollution discharged by each."

**16.** I am sensitive to the fact that "CERCLA 'can be terribly unfair in certain instances in which parties may be required to pay huge amounts for damages to which their acts did not contribute.' " *Redwing Carriers, Inc. v. Saraland Apartments, Ltd.*, 875 F.Supp. 1545, 1568 (S.D.Ala. 1995). This unfairness may be intensified where, as here, contribution from settling defendants may not be available. *See* 42 U.S.C. § 9613(f)(2); 964 F.2d at 270 n. 29. As our Court of Appeals recognized, Alcan's share of liability seems disproportionate from both a per capita and volumetric perspective. *Id.* But it is Alcan who chose the "all or nothing" approach, and it is this approach which obviates an evidentiary hearing on the "intensely factual" questions relevant to an apportionment of liability. In this regard, if I have misconstrued Alcan's position

### D. *The Act of God Defense*

■ In its Motion for Summary Judgment, Alcan argues that any release of hazardous substances was caused solely by an act of God, specifically, Hurricane Gloria. Alcan contends that the release occurred in connection with the torrential downpour of rain associated with the hurricane.[17]

Under the act of God defense, no liability attaches to a person who would otherwise be liable if that person can establish that the release of the hazardous substance and the damages which result were caused *solely* by an act of God. 42 U.S.C. § 9607(b). An act of God is defined as:

> an unanticipated grave natural disaster or other natural phenomenon of an exceptional, inevitable, and irresistible character, the effects of which could not have been prevented or avoided by the exercise of due care or foresight. 42 U.S.C. § 9601(1).

In *United States v. Stringfellow*, 661 F.Supp. 1053 (C.D.Cal.1987), the defendants contended that "heavy rainfall" was a natural disaster which constituted an act of God. The court concluded that heavy rainfall was "not the kind of 'exceptional' natural phenomenon" to which the "act of God exception applies." *Id.* at 1061.

■ Alcan, however, maintains that the release at the Site was caused not simply by heavy rainfall but by a hurricane which is "a grave natural disaster or phenomenon." Moreover, Alcan asserts that the hurricane was "unanticipated" as far north and inland as Pennsylvania. (Dkt.Entry 135 at 24.)

Alcan's reliance on the act of God defense must be rejected for at least three reasons. First, no reasonable factfinder could conclude that Hurricane Gloria was the *sole* cause of the release and resulting response costs. Two million gallons of hazardous wastes were not dumped into the borehole by an act of God, and were it not for the unlawful disposal of this hazardous waste Hurricane Gloria would not have flushed 100,000 gallons of this chemical soup into the Susquehanna River.

Second, the effects of Hurricane Gloria could "have been prevented or avoided by the exercise of due care or foresight." 42 U.S.C. § 9601(1). Clearly, exercise of due care or foresight would have militated against dumping hazardous wastes into mine workings that inevitably lead to such a significant natural resource as the Susquehanna River.

Finally, as the Court in *Stringfellow* recognized, heavy rainfall is "not the kind of 'exceptional' natural phenomenon to which the act of God exception applies." 661 F.Supp. at 1061. Accordingly, it is appropriate to enter judgment in favor of the Government on Alcan's act of God defense.

### III.

### CONCLUSION

Alcan has not met its "substantial" burden of proof with regard to the divisibility of harm at the Site. In fact, Alcan has not presented objective evidence relating to the relative toxicity, migratory potential or synergistic capacity of the hazardous waste at issue. Furthermore, Alcan has not attempted to demonstrate what volume of waste was disposed of at the Site, nor the percentage of that volume represented by Alcan's wastes. Alcan has not considered the effect of the commingling of its wastes with the other wastes at the site. Nor has Alcan presented a triable issue of fact with respect to the act

---

on this issue, Alcan can seek reconsideration of this decision.

**17.** The Government argues that because Alcan failed to raise this defense when this case was first presented on cross-motions for summary judgment that were then appealed to the Third Circuit, Alcan should be precluded from raising it at this stage of the proceedings. While it does seem incongruous that Alcan could have judgment entered against it and, on appeal, obtain a remand only on the issue of apportionment of liability, and then raise on remand a complete defense to liability based on the act of God defense, this Court does have discretion to address the merits of this affirmative defense. *See Habecker v. Clark Equipment Co.*, 942 F.2d 210, 217–18 (3rd Cir.1991). Despite the apparent unfairness of pursuing an affirmative defense for the first time on remand, (Alcan did assert the act of God defense in its response to the Complaint), discretion will be exercised to address the substance of Alcan's argument.

of God defense. Therefore, summary judgment will be granted in favor of the United States and Alcan's Motion for Summary Judgment will be denied. An appropriate Order is attached.

## ORDER

**AND NOW THIS 28th DAY OF JUNE,** 1995, in accordance with the attached Memorandum, **IT IS HEREBY ORDERED THAT:**

1) Plaintiff United States of America's Motion for Summary Judgment (Dkt.Entry 131) is **GRANTED.**

2) Defendant Alcan Aluminum Corporation's Motion for Summary Judgment (Dkt.Entry 135) is **DENIED.**

3) The Clerk of Court is directed to enter judgment in favor of the Plaintiff in the amount of $473,790.18.