United States Court of Appeals,

Eleventh Circuit.

No. 96-6645.

USA, acting at request of the Administrator of the United States Environmental Protection Agency (EPA), Plaintiff-Appellant,

v.

OLIN CORPORATION, Defendant-Appellee.

March 25, 1997.

Appeal from the United States District Court for the Southern District of Alabama. (No. 95-0526-BH-S), William Brevard Hand, District Judge.

Before ANDERSON, Circuit Judge, KRAVITCH and HENDERSON, Senior Circuit Judges.

KRAVITCH, Senior Circuit Judge:

Congress passed the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA") to counteract the environmental threats associated with hazardous waste disposal. In this case, the district court dismissed the government's complaint brought under CERCLA against Olin Corporation ("Olin"). It ruled that: (1) the Constitution prohibits enforcement of CERCLA against a party if the environmental effects of that party's conduct remain limited to its own property; and (2) CERCLA's cleanup liability provisions apply prospectively only. The government appeals and we reverse.

I.

Olin has operated a chemical manufacturing facility in McIntosh, Alabama since 1951. Until 1982, the plant produced mercury- and chlorine-based commercial chemicals that contaminated significant segments of Olin's property. This appeal involves one

such portion of the site, called Operable Unit # 1 ("OU-1"). Groundwater and soil pollution at OU-1 make it unfit for future residential use. Nevertheless, contamination from OU-1 presently remains localized to Olin's site because the company regulates groundwater flow beneath its property.[1]

## II.

The government brought a civil action in the district court, seeking a cleanup order against Olin and reimbursement for response costs, pursuant to sections 106(a) and 107 of CERCLA.[2] After negotiations, the parties agreed to a consent decree that called for Olin to pay all costs associated with remediation of OU-1. The proposal resolved Olin's liability for contamination at OU-1 caused by disposal activities before and after CERCLA's effective date of December 11, 1980, *see* 42 U.S.C. § 9652(a).

When the parties presented the consent decree to the district court, it *sua sponte* ordered them to address the impact of the Supreme Court's decision in *United States v. Lopez,* --- U.S. ----,

---

[1]The district court found that contaminants may migrate off-site, if a well in OU-1 should leak. *United States v. Olin Corp.,* 927 F.Supp. 1502, 1506 (S.D.Ala.1996). The government also notes that pollutants from Olin's operations have appeared off-site, albeit within federally-allowed concentration levels.

[2]*See* 42 U.S.C. §§ 9606(a) ("[W]hen the President determines that there may be an imminent and substantial endangerment to the public health or welfare or the environment because of an actual or threatened release of a hazardous substance from a facility, he may require the Attorney General of the United States to secure such relief as may be necessary to abate such a danger or threat and the district court ... shall have jurisdiction to grant such relief as the public interest and the equities of the case may require."); 9607(a)(1)(A), (2)(A) (providing that current and former disposal facility owners and operators are liable for "all costs of removal or remedial action incurred by the United States Government ... not inconsistent with the national contingency plan").

115 S.Ct. 1624, 131 L.Ed.2d 626 (1995) (invalidating Gun-Free School Zones Act under the Commerce Clause), on the legality of their proposal. Olin complied with that order by answering the original complaint. It asserted that the *Lopez* Court's construction of the Commerce Clause precluded constitutional application of CERCLA in this case. In addition, Olin contended that CERCLA was not intended to impose liability for conduct predating the statute's enactment. The district court agreed with Olin on both counts, denied the motion to enter the consent decree and dismissed the government's complaint.

## III.

We review *de novo* the constitutional challenge to CERCLA and the purely legal question of whether the statute's cleanup liability provisions apply retroactively. *See generally Heuer v. United States Secretary of State,* 20 F.3d 424, 426 (11th Cir.), *cert. denied,* --- U.S. ----, 115 S.Ct. 573, 130 L.Ed.2d 490 (1994).

## A.

The district court found that the enforcement of CERCLA against Olin violated the Commerce Clause as interpreted by the Supreme Court in *Lopez.* The *Lopez* Court held that the Commerce Clause empowers Congress to regulate: (1) channels of interstate commerce; (2) instrumentalities of and persons or things in interstate commerce; and (3) intrastate activities that substantially affect interstate commerce. *See Lopez,* --- U.S. at ---- - ----, 115 S.Ct. at 1629-30. This case, like *Lopez,* concerns the third category.

*Lopez* did not alter the constitutional standard for federal

statutes regulating intrastate activities.  *See id.* at ---- - ----, 115 S.Ct. at 1628-30 (documenting consistency of Court's Commerce Clause jurisprudence since 1942);  1637 (Kennedy, J., concurring) ("*Stare decisis* operates with great force in counseling us not to call in question the essential principles now in place respecting the congressional power to regulate transactions of a commercial nature.").  Simply stated, "the proper test requires an analysis of whether the regulated activity "substantially affects' interstate commerce."  *Id.* at ----, 115 S.Ct. at 1630.  Congress can maintain the constitutionality of its statutes under this standard by including in each a "jurisdictional element which would ensure, through case-by-case inquiry, that the [regulated activity] in question affects interstate commerce."  *Id.* at ----, 115 S.Ct. at 1631.[3]  In addition, Congress, or a committee thereof, can make legislative findings indicating that a statute regulates activities with a substantial effect on interstate commerce.   *See id.*   If Congress does so, a court may not override these findings unless they lack a rational basis.  *See Cheffer v. Reno,* 55 F.3d 1517, 1520-21 (11th Cir.1995) (upholding Freedom of Access to Clinic Entrances Act because legislative findings were "plausible and provided rational basis for concluding that the Access Act regulates activity which "substantially affects' interstate commerce").

---

[3]This court, for instance, upheld the constitutionality of the federal statute criminalizing firearm possession by felons, 18 U.S.C. § 922(g), because it requires the government to show, in each case, that the defendant's weapon either traveled in or affected commerce. *See United States v. McAllister,* 77 F.3d 387 (11th Cir.), *cert. denied,* --- U.S. ----, 117 S.Ct. 262, 136 L.Ed.2d 187 (1996).

When Congress fails to ensure a statute's compliance with the Commerce Clause, however, courts must determine independently whether the statute regulates "activities that arise out of or are connected with a commercial transaction, which viewed in the aggregate, substantially affect[ ] interstate commerce." *Lopez,* --- U.S. at ----, 115 S.Ct. at 1631. This determination turns on whether the statute constitutes "an essential part of a larger regulation of economic activity, in which the regulatory scheme could be undercut unless the intrastate activity were regulated." *Id.* A court's focus, thus, cannot be excessively narrow; if the statute regulates a "*class of activities* ... and that *class* is within the reach of the federal power, the courts have no power "to excise, as trivial, individual instances' of the class." *Perez v. United States,* 402 U.S. 146, 154, 91 S.Ct. 1357, 1361-62, 28 L.Ed.2d 686 (1971) (quoting *Maryland v. Wirtz,* 392 U.S. 183, 193, 88 S.Ct. 2017, 2022, 20 L.Ed.2d 1020 (1968), *overruled on other grounds, Nat'l League of Cities v. Usery,* 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976), *overruled by Garcia v. San Antonio,* 469 U.S. 528, 105 S.Ct. 1005, 83 L.Ed.2d 1016 (1985)). *See also Lopez,* --- U.S. at ----, 115 S.Ct. at 1629 (" "[W]here a general regulatory statute bears a substantial relation to commerce, the *de minimis* character of individual instances arising under that statute is of no consequence.' " (emphasis omitted) (quoting *Wirtz,* 392 U.S. at 197 n. 27, 88 S.Ct. at 2024 n. 27)).

The district court's Commerce Clause analysis conflicts with the foregoing standard in two main respects. First, the district court indicated that under *Lopez* a statute must regulate *economic*

activity directly to satisfy the Commerce Clause. *See Olin Corp.,* 927 F.Supp. at 1532. Actually, as noted above, *Lopez* reiterates that a statute will pass constitutional muster if it regulates an activity, whatever its nature, "that arise[s] out of or [is] connected with a commercial transaction, which viewed in the aggregate, substantially affects interstate commerce." *See Lopez,* --- U.S. at ----, 115 S.Ct. at 1631.[4] The district court also concluded that *Lopez* requires every statute enacted pursuant to Congress's Commerce Clause authority to contain a jurisdictional element. *See Olin Corp.,* 927 F.Supp. at 1532. In fact, the *Lopez* Court recognized that a statute without a jurisdictional element still would stand under the Commerce Clause, if the law satisfied the substantial effects test. *See Lopez,* --- U.S. at ---- - ----, 115 S.Ct. at 1632-34.[5]

Our evaluation of CERCLA under the foregoing framework leads us to reject Olin's constitutional challenge. Specifically, we conclude that although Congress did not include in CERCLA either legislative findings[6] or a jurisdictional element, the statute

[4]To the extent the *Lopez* Court considered whether the Gun-Free School Zones Act regulated "economic" activity, we view the decision as recognizing that laws aimed directly at economic activity are most likely to satisfy the substantial effects test.

[5]Other courts also have found the district court's interpretation of *Lopez* unpersuasive. *See, e.g., United States v. Wall,* 92 F.3d 1444, 1449 n. 11 (6th Cir.1996); *United States v. NL Indus.,* 936 F.Supp. 545, 560 (S.D.Ill.1996).

[6]Although CERCLA contains no formal findings regarding interstate commerce, the government contends Congress previously made such findings in the Resource Conservation and Recovery Act of 1976, Pub.L. No. 94-580, 90 Stat. 2795 (codified as part of the Solid Waste Disposal Act, 42 U.S.C. §§ 6901-6992). Olin argues that we should disregard those earlier findings. Our

remains valid as applied in this case because it regulates a class of activities that substantially affects interstate commerce. The proper analysis first requires identification of the "class of activities" involved in the case.[7] The class always "could be defined so narrowly as to cover only those activities that do not have a substantial impact on interstate commerce." *Proyect v. United States,* 101 F.3d 11, 14 (2d Cir.1996) (ruling that class of activities covered by drug control law was not "cultivation and personal consumption of marijuana," but rather "manufacture of controlled substances"). The government contends this suit involves regulation of releases of hazardous substances generally; Olin objects to this broad classification. In our view, the disposal of hazardous waste at the site of production, or "on-site," constitutes the narrowest, possible class.[8]

In light of this understanding, we must assess whether onsite waste disposal substantially affects interstate commerce. Because the legislative history of CERCLA documents how the unregulated management of hazardous substances, even strictly within individual

---

disposition of this case obviates the need to resolve this dispute. We do note that the Supreme Court at times considers findings from previous legislation. *Compare Wirtz,* 392 U.S. at 190 n. 13, 88 S.Ct. at 2020-21 n. 13 (examining findings from predecessor statute) *with Lopez,* --- U.S. at ----, 115 S.Ct. at 1632 (declining to review earlier findings where statute "represents a sharp break with prior enactments").

[7]*Lopez* did not overrule the class of activities approach *sub silentio,* as Olin contends. *See Proyect v. United States,* 101 F.3d 11, 13 (2d Cir.1996).

[8]Because the statute passes constitutional muster even when the class of activities is parsed as narrowly as possible, we need not determine definitively what class of activities actually ought to control.

states, significantly impacts interstate commerce, we conclude the statute can be applied constitutionally under the circumstances of this case.

When the Senate considered S. 1480, a bill containing cleanup liability provisions later substantially incorporated into CERCLA,[9] its Committee on Environment and Public Works ("the Committee") took notice of many facts that show a nexus between all forms of improper waste disposal and interstate commerce. First, the Committee noted the growth of the chemical industry and the concomitant costs of handling its waste. *See* S.Rep. No. 96-848, 96th Cong., 2d Sess. 2 (1980), *reprinted in* 1 *Legislative History of the Comprehensive Environmental Response, Compensation and Liability Act of 1980* 309 (1983) ("*Legislative History* "). It also cited a 1980 report by the Office of Technology Assessment which gauged agricultural losses from chemical contamination in six states at $283 million. *Id.* at 310.[10] The Committee reported that the commercial damages resulting from unregulated waste management were not attributable solely to interstate trafficking in hazardous materials for disposal, but also arose from accidents associated

---

[9]*Compare* S. 1480, 96th Cong.2d Sess. § 4(a)(1) (1979), *reprinted in* 1 *Legislative History of the Comprehensive Environmental Response, Compensation and Liability Act of 1980* 168 (1983), *with* 42 U.S.C. § 9607(a)(4)(A)-(B).

[10]In addition, Congress had substantial information that improper disposal of hazardous waste threatened natural resource-dependent, interstate industries, such as commercial fishing. *See, e.g., Legislative History* at 739 (statement of Sen. Culver) (noting that "half of the potential fishing in the Great Lakes [was] lost annually due to contamination-related curtailments"); 756 (statement of Sen. Leahy) (observing that contamination from releases in Virginia resulted in "[c]ountless numbers of commercial fishing ventures be[ing] forced out of business").

with purely intrastate, on-site disposal activities, such as improper waste storage in tanks, lagoons and chemical plants. *Id.* at 312. Thus, CERCLA reflects Congress's recognition that both on-site and off-site disposal of hazardous waste threaten interstate commerce.

Olin notes that the record contains no evidence that *its* onsite disposal has caused off-site damage, much less harmed interstate commerce. This argument is analogous to, and as unpersuasive as, the drug possessor's plea for an exemption from federal narcotics laws because his individual actions have no substantial effect upon interstate commerce. *See Proyect,* 101 F.3d at 14. Olin's claim fails because, as the foregoing discussion documents, the regulation of intrastate, on-site waste disposal constitutes an appropriate element of Congress's broader scheme to protect interstate commerce and industries thereof from pollution. *See Lopez,* --- U.S. at ----, 115 S.Ct. at 1631.

Olin also objects to enforcement of CERCLA in this case because it contends its disposal activities are not economic in nature. As stated above, the Commerce Clause conditions congressional authority not upon the qualities of the regulated activity, but rather the degree to which that activity affects interstate commerce. *See supra* note 4 and related text. Further, to the extent a chemical plant can dispose of its waste on-site free of regulation, it would have a market advantage over chemical companies that lack on-site disposal options;[11] Olin's actions,

---

[11]This fact not only would alter economic conditions in the chemical industry, but also would lead companies to opt out of the hazardous waste disposal market. In the aggregate, these

therefore, have an economic character.

For these reasons, we hold that, as applied in this case, CERCLA constitutes a permissible exercise of Congress's authority under the Commerce Clause.

B.

The district court also based its dismissal order on its conclusion that CERCLA's response cost liability scheme applies only to disposals after the statute's enactment.  This ruling not only conflicts with this court's recent description of CERCLA, but also runs contrary to all other decisions on point.  *See Virginia Properties Inc. v. Home Ins. Co.,* 74 F.3d 1131, 1132 (11th Cir.1996) (defining CERCLA as "a statutory scheme that retroactively imposed strict liability for pollution cleanup"); *Olin Corp.,* 927 F.Supp. at 1507 & n. 25 (recognizing that of the 22 federal courts "which have directly addressed the issue of CERCLA's retroactivity, none have declined to apply CERCLA on retroactivity grounds").[12]  The district court, however, held that *Landgraf v. USI Film Products,* 511 U.S. 244, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994), "demolishes the interpretive premises on which prior cases

---

developments likely would have a substantial effect on interstate commerce.  *See Wickard v. Filburn,* 317 U.S. 111, 128-29, 63 S.Ct. 82, 90-91, 87 L.Ed. 122 (1942) (ruling that a party's self-servicing of needs substantially affects broader markets); *see also Chemical Waste Management, Inc. v. Hunt,* 504 U.S. 334, 340 n. 3, 112 S.Ct. 2009, 2012-13 n. 3, 119 L.Ed.2d 121 (1992) (noting that hazardous waste long has been recognized as an article of commerce).

[12]In the face of this growing body of caselaw, Congress twice reauthorized CERCLA, once with substantive changes, without suggesting that the courts had misconstrued the statute regarding retroactivity.  *See* Omnibus Budget Reconciliation Act of 1990, Pub.L. No. 101-508, 104 Stat. 1388;  Superfund Amendment and Reauthorization Act of 1986, Pub.L. No. 99-49, 100 Stat. 1613.

had concluded that CERCLA is retroactive," and that this court's post-*Landgraf* statement in *Virginia Properties* constitutes irrelevant dicta. *Olin Corp.,* 927 F.Supp. at 1508.[13]

This court has recognized that *Landgraf* "provides the analytical framework for determining whether newly enacted statutory provisions are applicable to pending cases." *Hunter v. United States,* 101 F.3d 1565, 1569 (11th Cir.1996) (en banc) (applying certain sections of the Antiterrorism and Effective Death Penalty Act of 1996 to habeas corpus petitions pending on the Act's effective date).[14] In *Hunter,* we observed that "[a] court's first, and sometimes last, task under *Landgraf* analysis is "to determine whether Congress has expressly prescribed the statute's proper reach.' If Congress has done so, that is the end of the *Landgraf*

---

[13]Courts that have considered retroactivity challenges to CERCLA since the district court's decision in this case, unanimously have repudiated the ruling, and instead, have continued to give the statute retroactive effect. *See, e.g., Ninth Avenue Remedial Group v. Fiberbond Corp.,* 946 F.Supp. 651 (N.D.Ind.1996); *Nova Chems., Inc. v. GAF Corp.,* 945 F.Supp. 1098 (E.D.Tenn.1996); *Gould, Inc. v. A & M Battery & Tire* Serv., 933 F.Supp. 431 (M.D.Pa.1996); *see also State of Nevada v. United States,* 925 F.Supp. 691 (D.Nev.1996) (rejecting identical retroactivity claim prior to district court's ruling, but not cited by the district court as contrary authority); *United States v. Alcan Aluminum Corp.,* 892 F.Supp. 648 (M.D.Pa.1995) (same), *aff'd,* 96 F.3d 1434 (3d Cir.1996) (table).

[14]This passage from *Hunter* states only that *Landgraf* guides review of "newly enacted" laws. The *Landgraf* Court did not indicate whether courts should apply the decision to older statutes, such as CERCLA. To the extent *Landgraf* constitutes a dramatically new rule of statutory construction, as Olin and the district court suggest, a strong argument can be made that courts ought not to employ it to upset years of reliance on prior interpretations of existing laws. Because this complex issue was not raised by the parties, however, and because we view *Landgraf,* not as charting a radical new course, but as reaffirming a "traditional presumption," *Landgraf*, 511 U.S. at 280-81, 114 S.Ct. at 1505, we assume it governs our review of CERCLA today.

analysis, and the court simply follows the evident intent of Congress." *Id.* (quoting *Landgraf*, 511 U.S. at 280-81, 114 S.Ct. at 1505). *Hunter,* however, left open the question of whether "evidence of legislative intent, other than in an express statutory command" would satisfy *Landgraf* 's first prong. *Id.*[15]

Because CERCLA contains no explicit statutory command regarding retroactive application of its cleanup liability regime, this court must decide what, if any, further inquiry should occur. Although the *Landgraf* Court reaffirmed the presumption against retroactive application of statutes, it emphasized that courts must effectuate congressional intent regarding retroactivity. *See Landgraf*, 511 U.S. at 272-74, 114 S.Ct. at 1501 (stating that "constitutional impediments to retroactive civil legislation are now modest"). The Court ruled that its approach simply was designed to "assure[ ] that Congress itself has affirmatively considered the potential unfairness of retroactive application and determined that it is an acceptable price to pay for the countervailing benefits." *Id.* As a result, we conclude that even absent explicit statutory language mandating retroactivity, laws may be applied retroactively if courts are able to discern "*clear congressional intent* favoring such a result." *Id.* at 280, 114

---

[15]Other circuits have yet to develop a consistent approach to this issue. *See, e.g., Reyes-Hernandez v. Immigration and Naturalization Service,* 89 F.3d 490 (7th Cir.1996) (employing phrases "clear statement" and "clear intent" interchangeably); *Conservation Law Found., Inc. v. Busey,* 79 F.3d 1250 (1st Cir.1996) (considering legislative history in determining that Congress intended statute to apply retroactively).

S.Ct. at 1505 (emphasis added).[16]  Accordingly, we must review the language, structure and purpose of the statute, as well as its legislative history, to determine whether Congress made clear its intent to apply CERCLA's remediation liability scheme to conduct pre-dating the statute's enactment.

We examine first CERCLA's language.  As noted above, the statute contains no explicit statement regarding retroactive application of its cleanup liability provisions.  Olin mistakenly contends that CERCLA's text therefore offers no insight into Congress's intent on this subject.  CERCLA imposes liability for response costs upon "owners and operators" of "any site or area where a hazardous substance has been deposited...."  42 U.S.C. §§ 9601(9)(B), 9607(a)(1).  Its reach also extends to "any person who *at the time of disposal* of any hazardous substance *owned or operated* " such a facility.  42 U.S.C. § 9607(a)(2) (emphasis added).  Congress thus targeted both current and former owners and operators of contaminated sites.  By imposing liability upon former owners and operators, Congress manifested a clear intent to reach conduct preceding CERCLA's enactment.

Olin contends that by including this language Congress sought to reach *only* "future former owners and operators," i.e. persons who would become former owners and operators after December 11,

---

[16]Three justices objected to *Landgraf* because the majority adopted a "clear intent" standard, rather than a "clear statement" requirement.  *See Landgraf*, 511 U.S. at 286, 114 S.Ct. at 1522 (Scalia, J. concurring in the judgment) (criticizing majority for considering not only "the text of the law in question, but [also statements by] individual legislators who participated in the enactment of the law, and even legislators in an earlier Congress which tried and failed to enact a similar law").

1980, CERCLA's effective date.  It has pointed to nothing in the statute or its legislative history which supports this strained view.  In fact, language elsewhere in CERCLA confirms that Congress intended that persons who were former owners and operators as of December 11, 1980, would bear the costs of cleaning up sites they formerly controlled.  For example, section 103 provides that:

> *Within one hundred and eighty days after December 11, 1980, any person* who owns or operates or *who at the time of disposal owned or operated* ... a facility at which hazardous substances ... are or *have been* stored, treated, or disposed of shall ... notify the Administrator of the Environmental Protection Agency of the existence of such facility, specifying the amount and type of any hazardous substance to be found there, and any known, suspected, or likely releases of such substances from such facility.

42 U.S.C. § 9603(c)(emphasis added).

Read reasonably, the foregoing subsection addresses conduct that occurred *before CERCLA's effective date.*  It expressly mandates that persons who were former owners and operators *as of December 11, 1980,* make the required notification regarding their pre-enactment conduct within six months, or forfeit "any defenses to liability set out in section [107] of this title...."  *Id.* If, as Olin asserts, these former owners and operators faced no liability under section 107, section 103 makes virtually no sense. We conclude the language of section 103 confirms that Congress believed its imposition of liability for cleanup upon former owners and operators in section 107(a) covered persons who were former owners and operators on December 11, 1980, as well as owners and operators who sold their interests after that date.[17]

_____

[17]Congress's decision to include an express limitation on retroactivity in the natural resource damage provision, but not in the adjacent response cost subsection further shows its intent

An analysis of CERCLA's purpose, as evinced by the statute's structure and legislative history, also supports the view that Congress intended the statute to impose retroactive liability for cleanup. Olin acknowledges that CERCLA was designed to deal with contamination that preceded the statute's effective date of December 11, 1980. *See Legislative History* at 308-19 (Committee Report) (discussing concern for pre-enactment contamination, including inactive sites). It insists, however, that Congress intended for taxpayers in both industry and the general public to bear the response costs associated with these earlier disposal problems. This argument ignores the fact that "[a]n essential purpose of CERCLA is to place the ultimate responsibility for the clean up of hazardous waste on "those responsible for problems caused by the disposal of chemical poison.' " *Redwing Carriers, Inc. v. Saraland Apts.,* 94 F.3d 1489, 1501 (11th Cir.1996) (internal citations omitted).[18] Congress's twin goals of cleaning

to impose retroactive liability for remediation. Although the *Landgraf* Court declined to place substantial weight on negative inferences drawn from "comparatively minor and narrow provisions in a long and complex statute," *Landgraf*, 511 U.S. at 257-59, 114 S.Ct. at 1493, it "did not preclude all future use of a negative inference analysis in support of retroactive intent." *Nevada*, 925 F.Supp. at 693. "Unlike the prospective provisions in the 1991 Civil Rights Act discussed by the Landgraf Court which were not connected to the specific provision that the plaintiff wanted to apply retroactively, liability for response costs, liability for natural resource damages, and the prospective limitation for natural resource damages are all part of the same section in CERCLA." *Ninth Avenue,* 946 F.Supp. at 659.

[18]CERCLA authorizes the government to bear response costs only "where a liable party does not clean up, cannot be found, or cannot pay the costs of cleanup...." *Legislative History* at 320 (Committee Report). The statute's structure, which lists the liability provisions ahead of the government-funding sections, confirms these priorities. *See* 42 U.S.C. §§ 9607, 9611.

up pollution that occurred prior to December 11, 1980, and of assigning responsibility to culpable parties can be achieved only through retroactive application of CERCLA's response cost liability provisions; this fact provides additional evidence of clear congressional intent favoring retroactivity.[19]

Further review of CERCLA's legislative history confirms that Congress intended to impose retroactive liability for cleanup. The chief predecessor bill to CERCLA, S. 1480, contained no express statement regarding retroactivity. "Nonetheless, all those commenting on [it and the parallel House bill] expressed the belief that the bills would apply retroactively to those responsible for the releases in existing waste sites." *Ninth Avenue*, 946 F.Supp. at 662. *See Legislative History* at 344 (Committee Report) (noting that S. 1480 contained a subsection limiting "how claims for certain damages occurring before the date of enactment will be handled," but observing that "[c]osts of removal (cleanup and containment) are not affected by this provision"); 405 (statement of Administrator Costle) ("The legislation proposed would establish liability for costs expended by the government to clean up past disposal practices that *today* are threatening public health and the environment, and it does so without reference to prior standards.").

---

[19]As Olin points out, the Supreme Court has held that the clear intent standard requires more than a recognition that "retroactive application of a new statute would vindicate its purpose more fully." *Landgraf*, 511 U.S. at 283-85, 114 S.Ct. at 1507-08. In this case, however, retroactive enforcement of CERCLA does more than merely allow a "fuller vindication" of the statute's purposes; it prevents frustration of the statute's purposes.

Olin insists we should disregard this extensive legislative history because Congress passed a compromise bill. This argument fails because the cleanup liability provisions from S. 1480 were incorporated into CERCLA. *See supra* note 9 and related text. Moreover, careful scrutiny of the legislative record leading up to CERCLA's passage reveals that the compromise never turned upon the statute's imposition of retroactive liability for cleanup, but rather upon the redaction of the prior bill's provisions on joint and several liability and personal injury. *See, e.g., Legislative History* at 681-91 (statement of Sen. Randolph); 691-96 (statement of Sen. Stafford).[20]

For all these reasons, we find clear congressional intent favoring retroactive application of CERCLA's cleanup liability provisions.

## IV.

Accordingly, the district court's dismissal order is REVERSED. The case is REMANDED for further proceedings consistent with this

[20]Olin asserts that S. 1480 came out of the Committee "over strong opposition by three Republicans: Minority Leader Howard Baker and Senators Domenici and Bentsen. Their concerns with the liability provisions of S. 1480 centered on its imposition of retroactive liability." Appellee's Br. at 24. Olin reiterates that these three Senators, one of whom, Bentsen, was a Democrat, not a Republican, "opposed" S. 1480, and observes that "[i]t is highly doubtful that all three of the S. 1480 *dissenters* would have climbed on board if the retroactivity that troubled them had not been either removed or deferred." *Id.* at 26 (emphasis added). These representations by Olin contain what can be described, most charitably, as misstatements of the record. The cited Senators expressly "did not oppose reporting out S. 1480," and offered "additional," not "dissenting" views. *Legislative History* at 426 (Additional Views of Senators Domenici, Bentsen and Baker). Moreover, read in context, their statement appended to the Committee Report does not focus on retroactive liability for cleanup, but rather the provisions regarding strict, joint and several liability and personal injury. *See id.* at 426-29.

opinion.