**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| PETER J. VOGGENTHALER; WILLIAM MONTERO; BARBARA MONTERO; CLIFFORD ROGERS; SHARON ROGERS; HERMANN ROSNER; MARCUS ROTHKRANZ; DANIEL SOLDINI; CHARLES WALKER; VERNA WALKER; JACK YENCHECK; OFELIA YENCHECK; RICHARD MALM; ROGER ELLSWORTH; JO ANN ELLSWORTH; MARGARET RUDELICH-HOPPE; PATRICIA MAHONEY; RICHARD FALEN; PETER LEARNED; KRISTIAN MEIER; ELIZA ACOSTA; MIRHA ELIAS; AIKO BERGE; VICTOR BECERRA; ARTHUR BODENDORFER; BRENDA C. CHAFFIN; MICHAEL J. SOLMI; JASON COWLES; JANE GAUTHIER; HONORE GAUTHIER; NIKOLAS KONSTANTINOU; DRAGAN KURAJICA; KENNETH LOWTHER; JAMES LUEHMANN; JACQUELINE LUEHMANN; RUTH MANNHEIMER; STATE OF NEVADA, on behalf of Department of Conservation & Natural Resources, Division of Environmental Protection, | No. 10-17520 <br><br> D.C. No. 2:08-cv-01618-RCJ-GWF |
| *Plaintiffs-Appellees*, | |
| v. | |

Maryland Square LLC,
     *Defendant-Appellant*,

and

MARYLAND SQUARE SHOPPING
CENTER LLC; HERMAN KISHNER
TRUST, DBA Maryland Square
Shopping Center; IRWIN KISHNER;
JERRY ENGEL; BANK OF AMERICA,
NA, Trustee on behalf of Herman
Kishner Trust; CLARK COUNTY
SCHOOL DISTRICT; MELVIN
SHAPIRO; SHAPIRO BROTHERS
INVESTMENT COMPANY,
          *Defendants*.

---

PETER J. VOGGENTHALER; WILLIAM
MONTERO; BARBARA MONTERO;
CLIFFORD ROGERS; SHARON
ROGERS; HERMANN ROSNER;
MARCUS ROTHKRANZ; DANIEL
SOLDINI; CHARLES WALKER; VERNA
WALKER; JACK YENCHECK; OFELIA
YENCHECK; RICHARD MALM; ROGER
ELLSWORTH; JO ANN ELLSWORTH;
MARGARET RUDELICH-HOPPE;
PATRICIA MAHONEY; RICHARD
FALEN; PETER LEARNED; KRISTIAN
MEIER; ELIZA ACOSTA; MIRHA
ELIAS; AIKO BERGE; VICTOR
BECERRA; ARTHUR BODENDORFER;

No. 11-15174

D.C. Nos.
2:08-cv-01618-
RCJ-GWF
3:09-cv-00231-
RCJ-GWF

BRENDA C. CHAFFIN; MICHAEL J.
SOLMI; JASON COWLES; JANE
GAUTHIER; HONORE GAUTHIER;
NIKOLAS KONSTANTINOU; DRAGAN
KURAJICA; KENNETH LOWTHER;
JAMES LUEHMANN; JACQUELINE
LUEHMANN; RUTH MANNHEIMER,
*Plaintiffs-Appellees*,

MARYLAND SQUARE SHOPPING
CENTER LLC, Trustee on behalf of
Herman Kishner Trust,
*Defendant-Intervenor*,

STATE OF NEVADA, on behalf of
Department of Conservation &
Natural Resources, Division of
Environmental Protection,
*Plaintiff-Intervenor*,

BANK OF AMERICA, NA, Trustee on
behalf of Herman Kishner Trust;
JERRY ENGEL, Trustee on behalf of
Herman Kishner Trust; HERMAN
KISHNER TRUST, Trustee on behalf
of Herman Kishner Trust, DBA
Maryland Square Shopping Center;
IRWIN KISHNER, Trustee on behalf of
Herman Kishner Trust,
*Defendants-Intervenors*,

v.

SHAPIRO BROTHERS INVESTMENT
COMPANY,
*Defendant-Appellant*,

and

CLARK COUNTY SCHOOL DISTRICT;
MELVIN SHAPIRO; MARYLAND
SQUARE LLC, Trustee on behalf of
Herman Kishner Trust,
*Defendants*.

---

PETER J. VOGGENTHALER; WILLIAM
MONTERO; BARBARA MONTERO;
CLIFFORD ROGERS; SHARON
ROGERS; HERMANN ROSNER;
MARCUS ROTHKRANZ; DANIEL
SOLDINI; CHARLES WALKER; VERNA
WALKER; JACK YENCHECK; OFELIA
YENCHECK; RICHARD MALM; ROGER
ELLSWORTH; JO ANN ELLSWORTH;
MARGARET RUDELICH-HOPPE;
PATRICIA MAHONEY; RICHARD
FALEN; PETER LEARNED; KRISTIAN
MEIER; ELIZA ACOSTA; MIRHA
ELIAS; AIKO BERGE; VICTOR
BECERRA; ARTHUR BODENDORFER;
BRENDA C. CHAFFIN; MICHAEL J.
SOLMI; JASON COWLES; JANE
GAUTHIER; HONORE GAUTHIER;
NIKOLAS KONSTANTINOU; DRAGAN
KURAJICA; KENNETH LOWTHER;

No. 11-15176

D.C. Nos.
2:08-cv-01618-
RCJ-GWF
3:09-cv-00231-
RCJ-GWF

JAMES LUEHMANN; JACQUELINE
LUEHMANN; RUTH MANNHEIMER;
STATE OF NEVADA, on behalf of
Department of Conservation &
Natural Resources, Division of
Environmental Protection,
              *Plaintiffs*,

v.

MARYLAND SQUARE SHOPPING
CENTER LLC; HERMAN KISHNER
TRUST, DBA Maryland Square
Shopping Center; IRWIN KISHNER;
JERRY ENGEL; BANK OF AMERICA,
Trustee on behalf of Herman
Kishner Trust,
              *Defendants-Appellees*,

v.

MELVIN SHAPIRO; SHAPIRO
BROTHERS INVESTMENT COMPANY,
              *Defendants-Appellants*,

and

MARYLAND SQUARE LLC; CLARK
COUNTY SCHOOL DISTRICT,
              *Defendants*.

PETER J. VOGGENTHALER; WILLIAM MONTERO; BARBARA MONTERO; CLIFFORD ROGERS; SHARON ROGERS; HERMANN ROSNER; MARCUS ROTHKRANZ; DANIEL SOLDINI; CHARLES WALKER; VERNA WALKER; JACK YENCHECK; OFELIA YENCHECK; RICHARD MALM; ROGER ELLSWORTH; JO ANN ELLSWORTH; MARGARET RUDELICH-HOPPE; PATRICIA MAHONEY; RICHARD FALEN; PETER LEARNED; KRISTIAN MEIER; ELIZA ACOSTA; MIRHA ELIAS; AIKO BERGE; VICTOR BECERRA; ARTHUR BODENDORFER; BRENDA C. CHAFFIN; MICHAEL J. SOLMI; JASON COWLES; JANE GAUTHIER; HONORE GAUTHIER; NIKOLAS KONSTANTINOU; DRAGAN KURAJICA; KENNETH LOWTHER; JAMES LUEHMANN; JACQUELINE LUEHMANN; RUTH MANNHEIMER,
*Plaintiffs*,

and

STATE OF NEVADA, on behalf of Department of Conservation & Natural Resources, Division of Environmental Protection,
*Plaintiff-Appellee*,

v.

No. 12-16409

D.C. Nos.
2:08-cv-01618-RCJ-GWF
3:09-cv-00231-RCJ-GWF

MARYLAND SQUARE LLC;
MARYLAND SQUARE SHOPPING
CENTER LLC; HERMAN KISHNER
TRUST, DBA Maryland Square
Shopping Center; IRWIN KISHNER;
JERRY ENGEL; BANK OF AMERICA,
NA, Trustee on behalf of Herman
Kishner Trust; CLARK COUNTY
SCHOOL DISTRICT; MELVIN
SHAPIRO,
*Defendants*,

and

SHAPIRO BROTHERS INVESTMENT
COMPANY,
*Defendant-Appellant*.

---

PETER J. VOGGENTHALER; WILLIAM
MONTERO; BARBARA MONTERO;
CLIFFORD ROGERS; SHARON
ROGERS; HERMANN ROSNER;
MARCUS ROTHKRANZ; DANIEL
SOLDINI; CHARLES WALKER; VERNA
WALKER; JACK YENCHECK; OFELIA
YENCHECK; RICHARD MALM; ROGER
ELLSWORTH; JO ANN ELLSWORTH;
MARGARET RUDELICH-HOPPE;
PATRICIA MAHONEY; RICHARD
FALEN; PETER LEARNED; KRISTIAN
MEIER; ELIZA ACOSTA; MIRHA
ELIAS; AIKO BERGE; VICTOR

No. 12-16412

D.C. No.
2:08-cv-01618-
RCJ-GWF

OPINION

BECERRA; ARTHUR BODENDORFER;
BRENDA C. CHAFFIN; MICHAEL J.
SOLMI; JASON COWLES; JANE
GAUTHIER; HONORE GAUTHIER;
NIKOLAS KONSTANTINOU; DRAGAN
KURAJICA; KENNETH LOWTHER;
JAMES LUEHMANN; JACQUELINE
LUEHMANN; RUTH MANNHEIMER,
*Plaintiffs*,

and

STATE OF NEVADA, on behalf of
Department of Conservation &
Natural Resources, Division of
Environmental Protection,
*Plaintiff-Appellee*,

v.

MARYLAND SQUARE LLC,
*Defendant-Appellant*,

and

MARYLAND SQUARE SHOPPING
CENTER LLC; HERMAN KISHNER
TRUST, DBA Maryland Square
Shopping Center; IRWIN KISHNER;
JERRY ENGEL; BANK OF AMERICA,
NA, Trustee on behalf of Herman
Kishner Trust; CLARK COUNTY
SCHOOL DISTRICT; MELVIN

SHAPIRO; SHAPIRO BROTHERS
INVESTMENT COMPANY,
                    *Defendants*.

Appeal from the United States District Court
for the District of Nevada
Robert Clive Jones, Chief District Judge, Presiding

Argued and Submitted
April 17, 2013—San Francisco, California

Filed July 26, 2013

Before: Mary M. Schroeder, Sidney R. Thomas,
and Barry G. Silverman, Circuit Judges.

Opinion by Judge Schroeder

SUMMARY[*]

**Environmental Law**

The panel affirmed in part and reversed in part the district court's judgments in litigation under the Comprehensive Environmental Response, Compensation, and Liability Act and the Resource Conservation and Recovery Act concerning

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

seepage of a toxic dry cleaning chemical into the ground under a Las Vegas shopping center.

The district court granted summary judgment in favor of neighboring homeowners who sought injunctive relief against the property owners of the shopping center and operators of the dry cleaning facility.  The district court also granted summary judgment in favor of the Nevada Division of Environmental Protection, which sought to recover its cleanup costs.  The panel largely affirmed the district court's judgments.  It affirmed the district court's rejection of the contention that application of CERCLA to soil and groundwater contamination that occurred solely in Nevada violated the Commerce Clause.

The panel vacated the grant of summary judgment under CERCLA against the current owner and remanded so that the owner might have an opportunity to make the additional showing that would be necessary to establish that it met an exception to CERCLA liability for bona fide prospective purchasers.  The panel reversed on procedural grounds the grant of summary judgment under RCRA against the current owner and the operators because those defendants did not have an adequate opportunity to respond to plaintiffs' claims. The panel reversed the grant of summary judgment against a guarantor because there was no evidence of spills during the term of his guaranty.

**COUNSEL**

Alexander Robertson, IV and Jennifer L. Taylor, Robertson & Associates, LLP, Las Vegas, Nevada; Jan Adam Greben, Greben & Associates, Santa Barbara, California, for Plaintiffs-Appellees Peter J. Voggenthaler, et al.

Catherine Cortez Masto, Attorney General, Carolyn E. Tanner (argued), Senior Deputy Attorney General, and Jasmine K. Mehta (argued), Deputy Attorney General, Carson City, Nevada, for Plaintiff-Intervenor-Appellee Nevada Division of Environmental Protection.

Thomas Vandenburg, Joshua Levine, Christopher Smith and John A. Lawrence (argued), Dongell Lawrence Finney, LLP, Los Angeles, California, for Defendants-Iintervenors-Appellees Maryland Square Shopping Center, LLC, et al.

Jeremy Gilman and Gregory J. Lucht (argued), Benesch, Friedlander, Coplan & Aronoff, LLP, Cleveland, Ohio; Jeffrey T. Oberman, Levin & Oberman, Beverly Hills, California, for Defendants-Appellants Melvin Shapiro and Shapiro Brothers Investment Co.

Franklin H. Levy and Joshua M.D. Segal (argued), Lawson & Weitzen, LLP, Boston, Massachusetts; Shan Davis, Shan Davis & Associates, Las Vegas, Nevada, for Defendant-Appellant Maryland Square, LLC.

**OPINION**

SCHROEDER, Circuit Judge:

Two environmental statutes everyone loves to hate are the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA") and the Resource Conservation and Recovery Act ("RCRA"). In combination, they make owners of contaminated property and contributors to contamination responsible for cleaning up toxic waste, and, if someone else cleans up the waste, liable for the costs of that clean up. This litigation illustrates the point. It involves seepage over several decades of a toxic dry cleaning chemical into the ground under a Las Vegas shopping center. There have been two district court actions leading to multiple appeals.

Neighboring homeowners brought the first action, seeking injunctive relief against the property owners of the shopping center and operators of the dry cleaning facility. The Nevada Division of Environmental Protection ("NDEP") brought the other action to recover its clean up costs. The district court granted summary judgment for both sets of plaintiffs on all claims. The current owner and the former operators of the dry cleaning facility appeal. There are numerous procedural issues, but the principal legal contention is that application of CERCLA to this conduct that occurred solely in Nevada violates the Commerce Clause.

We largely affirm the district court, including its rejection of that constitutional challenge. We vacate the grant of summary judgment under CERCLA against the current owner and remand so the owner may have an opportunity to make the additional showing that would be necessary to establish

that it meets an exception to CERCLA liability.  We reverse on procedural grounds the grant of summary judgment under RCRA against the current owner and the operators because those defendants did not have an adequate opportunity to respond to plaintiffs' claims.  We also reverse the grant of summary judgment against one guarantor, because there is no evidence of spills during the term of his guaranty.

## THE STATUTES

CERCLA and RCRA, passed by Congress within a few years of each other, both address the problem of environmental contamination from hazardous waste disposal, but they employ different means.  Congress passed CERCLA in 1980, motivated by several environmental catastrophes, especially the infamous Love Canal disaster in Niagra Falls, New York.  S. Rep. No. 96-848, at 8–10 (1980).  The statute authorizes governments or private parties to clean up polluted sites and seek compensation from the polluters.  42 U.S.C. § 9607.  It is designed to ensure that the cost of clean up is "borne by those responsible for the contamination." *Burlington N. & Santa Fe Ry. Co. v. United States*, 556 U.S. 599, 602 (2009).  In this case, NDEP began a clean up of the contaminated site due to the inaction of the owners and operators, and then sued for the funds it had expended and those that it would need to expend in the future.

RCRA, passed in 1976, focuses on limiting waste production and ensuring that when waste is produced, it is treated and disposed of properly.  It plugged a then-existing loophole in environmental law. Before its passage, disposing pollutants into the water and air was regulated, but the land disposal of hazardous substances was not.  H.R. Rep. No. 94-1491, at 4 (1976).  RCRA's primary purpose was "to reduce

the generation of hazardous waste and to ensure the proper treatment, storage, and disposal of that waste which is nonetheless generated, 'so as to minimize the present and future threat to human health and the environment.'" *Meghrig v. KFC W., Inc.*, 516 U.S. 479, 483 (1996) (quoting 42 U.S.C. § 6902(b)). RCRA, in 42 U.S.C. § 6972, authorizes citizen suits for two types of injunctive relief—an injunction ordering the responsible parties to clean up the contamination and an injunction ordering them to stop any further violations. *See Meghrig*, 516 U.S. at 484. At the time of the homeowners' suit, the toxic spills had already occurred and the dry cleaning operations had ceased. The homeowners therefore sought an injunction ordering the owners and operators to clean up, test, and monitor the contaminated site.

## FACTS AND PROCEDURAL BACKGROUND

### I. History of the Site and Its Contamination

Maryland Square Shopping Center ("the Site"), a Las Vegas shopping center, was from 1969 to 2000 home to a dry cleaning facility responsible for environmental contamination. Maryland Square LLC ("Maryland Square"), the current owner of the Site, has owned it since 2005. The Site has had many prior owners, but only the Herman Kishner Trust, a non-appealing defendant, owned the Site during the contamination period. During that period two companies leased the Site and operated the dry cleaning facility. Shapiro Bros. Investment Co. ("SBIC") operated it from 1969 until 1984. Johnson Group, Inc., the predecessor of DCI USA, Inc., (collectively "DCI") purchased the dry cleaning business in 1984 and operated it until 2000.

The history is summarized in the following chart showing the owners, operators, and known or alleged chemical spills:

| Year | Owners | Operators | Known/Alleged Incidents |
|------|--------|-----------|-------------------------|
| 1968 | Herman Kishner | N/A | N/A |
| 1969–1984 | Herman Kishner Trust (w/ Maryland Square Shopping Center LLC as successor-in-interest) | Shapiro Bros. Investment Co. | Spill of ~100 gallons of PCE in 1982. Occasional spills from a clogged button trap between 1969–1984. |
| 1984–2000 | Herman Kishner Trust (w/ Maryland Square Shopping Center LLC as successor-in-interest) | DCI | Alleged to have used PCE in its operations. No confirmed spills. |
| 2000–2002 | Herman Kishner Trust (w/ Maryland Square Shopping Center LLC as successor-in-interest) | N/A | N/A |
| 2002–2005 | Clark County School District | N/A | N/A |
| 2005–Present | Maryland Square LLC | N/A | Demolition of Site in 2006 allegedly spread PCE. |

Herman Kishner constructed the Site in 1968 and transferred ownership to the Herman Kishner Trust the following year. Beginning in 1969, the Trust leased the dry cleaning facility to SBIC, and SBIC agreed in the lease to indemnify the Trust for all claims arising from SBIC's

actions, omissions, or negligence. SBIC signed a replacement lease in 1982 in which it agreed to indemnify the Trust for violations of law. SBIC sold the dry cleaning business to DCI in 1984. As part of the sale, Melvin Shapiro, who formed and controlled SBIC with his brother Philip Shapiro, personally guaranteed DCI's performance of the lease obligations, including the obligation to indemnify the Site's owner for any future violations of law.

The contamination at the Site was produced by a chemical commonly used in the dry cleaning industry and called tetrachloroethylene ("PCE"). PCE is a hazardous substance as defined by CERCLA and the Nevada Administrative Code. 42 U.S.C. § 9601(14); Nev. Admin. Code § 445A.3454. During its operation of the dry cleaning facility, SBIC used, and spilled, PCE. According to former SBIC employees, from time to time "a button trap would clog and amounts of PCE would spill onto the concrete floor." SBIC also admitted that a spill of roughly 100 gallons of PCE occurred during a filter change in 1982. When PCE spilled, it fell onto a concrete floor equipped with a "trench style floor drain." The PCE then went down the drain through the pipes beneath the floor and into the ground and groundwater.

## II. Entry of the State of Nevada and Its Clean Up Efforts

The PCE discharge was first reported to NDEP on November 29, 2000, during a pre-purchase investigation by Clark County School District. When Maryland Square purchased the property from the School District in 2005, Maryland Square was aware of the contamination. Maryland Square demolished the building in 2006, including the contaminated floor, but made no efforts to remove any contaminant beneath it.

After the initial discovery, NDEP, on July 21, 2001, received a report from the environmental consultant performing Clark County's pre-purchase investigation. NDEP oversaw further investigation of the Site that revealed the presence of PCE in the soil and groundwater. The highest PCE concentrations were found in and around the floor drain and drain pipes beneath the former dry cleaning facility. The investigation also revealed a plume of PCE-contaminated groundwater emanating from the Site and extending eastward into a nearby residential Las Vegas neighborhood. NDEP then began its lengthy clean up of the soil.

The contaminated plume was a cause for concern. On the basis of a soil gas report submitted to NDEP in 2007, NDEP determined that there was a potential for PCE vapor intrusion into the neighborhood homes at concentrations that could materially increase the probability of cancer in exposed individuals. To address the risks posed by PCE evaporating into the air, NDEP offered to install subslab depressurization systems in the homes. NDEP recognized, however, that it also needed to reduce the PCE concentrations in the groundwater in order to prevent potential future exposures, because the plume was moving away from the Site. NDEP informed residents, property owners, and government officials of the PCE contamination in the groundwater and the possible health effects.

NDEP also notified the current and former owners and operators of the Site that NDEP considered them to be potentially responsible parties under CERCLA for clean up costs. NDEP stated in those notices in 2008 that it already had expended approximately $160,000, that it intended to spend more funds to address human exposure to PCE, and that it planned to seek recovery of its expenses. NDEP has

continued its clean up efforts over the following years, and removed the contaminated soil in 2011.

## III.     History of the Litigation

In late 2008 and early 2009 two suits were filed in the United States District Court for the District of Nevada against the owners and operators of the Site.  NDEP sued them under both CERCLA and Nevada state law.  Peter Voggenthaler, with other neighborhood homeowners, sued under RCRA.  In the homeowners' RCRA suit, the owners filed cross-claims against the operators for indemnity.

NDEP's action under CERCLA sought to recover the costs of cleaning up the Site and a declaratory judgment entitling NDEP to future clean up costs.  NDEP contended that all of the defendants, as owners or operators of a facility that had released toxic chemicals, were liable under CERCLA.  Each of the defendants offered a separate reason for why it was not liable, and several of the defendants contended that the application of CERCLA to conduct solely within Nevada violates the Commerce Clause.  NDEP, under Nevada state law, also sought recovery of clean up costs and injunctive relief to prevent further violations.  The district court eventually granted summary judgment for NDEP on all of its claims on May 17, 2012.

The homeowners filed their complaint under RCRA seeking an injunction forcing all of the Site's owners to clean up the contamination, and contending that the owners were contributors under RCRA.  The homeowners did not seek relief under state law.  The Site's owners all took the position that they were not responsible for the actual spills, even though they knowingly leased the Site to a dry cleaning

business and profited from the operation of that business. The district court granted summary judgment for the plaintiffs and against all of the owners on July 22, 2010.

The current owner, Maryland Square, however, moved for rehearing after the entry of summary judgment on its RCRA liability, contending that it was in a different position from the other owners because its ownership of the property did not begin until after the dry cleaning facility had closed down. The homeowners responded to the motion for rehearing, contending that Maryland Square nevertheless should be considered a contributor under RCRA because its demolition of the building in 2006 had exacerbated the situation by exposing and disseminating the contamination. The homeowners relied on the expert report that had been attached to their summary judgment reply.

The district court, however, did not resolve the issue of Maryland Square's liability raised in the reconsideration motion. Instead, the court concluded in an October 20, 2010 order that it lacked jurisdiction because the motion involved the merits of the owners' RCRA liability, and the other owners had already filed a notice of appeal from the summary judgment order on RCRA liability. (That premature appeal was later consolidated by our court with the owners' appeal of the RCRA permanent injunction after the district court proceedings became final.)

The district court then did enter a permanent injunction under RCRA on December 27, 2010, ordering a clean up of the Site. Although the plaintiffs had moved for summary judgment on RCRA liability against only the owners, the district court not only granted that motion, but, sua sponte, also entered judgment and ordered injunctive relief against

operator SBIC as well, even though plaintiffs had not moved for such relief.

The owners' leases to the operators contained indemnification provisions. The owners therefore moved for judgment in the RCRA litigation on their cross-claims for indemnity against SBIC and Melvin Shapiro as operators. The district court granted the motion as to both on October 20, 2010. Although only SBIC actually operated the business, the court held Melvin Shapiro liable on the basis of the guaranty he signed on the 1984 transfer of the business from SBIC to DCI. The court rejected his position that the guaranty acted only prospectively and did not take effect until after the spills occurred.

We consider multiple appeals in each action.

## DISCUSSION

### I. Application of CERCLA to Soil and Groundwater Contamination in Nevada Does Not Offend the Commerce Clause

Maryland Square's appeal challenges the application of CERCLA to the contamination of the Site as violating the Commerce Clause, because the PCE disposal physically affected the Site and a nearby neighborhood within the state of Nevada. The district court summarily rejected this claim. Maryland Square relies primarily on the Supreme Court's opinions in *United States v. Lopez*, 514 U.S. 549 (1995), and *United States v. Morrison*, 529 U.S. 598 (2000), the two Commerce Clause decisions of the last twenty years invalidating Congressional enactments. Neither involved environmental issues. *Lopez* concerned regulation of conduct

near a school and *Morrison* involved violence against an individual.

The Constitution states that "The Congress shall have Power . . . To regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." U.S. Const. Art. I, § 8, cl. 3. This grant of authority has been separated into three broad categories. *Perez v. United States*, 402 U.S. 146, 150 (1971). Under its commerce power, Congress may regulate (1) "the use of the channels of interstate or foreign commerce," (2) "the instrumentalities of interstate commerce . . . or persons or things in commerce," and (3) "those activities affecting commerce." *Id.* These categories were recognized in both *Lopez* and *Morrison*. Maryland Square contends that none of the three categories apply, but two of them do.

The application of CERCLA to contaminated soil and groundwater is proper under the second and third categories as regulation of articles in commerce and activities affecting commerce. Groundwater may be regulated as an article of commerce, because any item that may be bought or sold, indeed all objects of trade, are articles of commerce. *See Fort Gratiot Sanitary Landfill, Inc. v. Michigan Dep't of Natural Res.*, 504 U.S. 353, 359 (1992). The Supreme Court has expressly held that groundwater is an article of commerce, because it can be traded. *Sporhase v. Nebraska, ex rel. Douglas*, 458 U.S. 941, 953–54 (1982). There, the state of Nebraska, in defending a state law limiting the interstate sale of Nebraska groundwater, tried to contend that groundwater was not an article of commerce. *Id.* at 951–52. According to Nebraska, groundwater was not an article of commerce because Nebraska's residents did not enjoy an unlimited ownership interest in the groundwater they withdrew and

because groundwater was essential to its citizens' survival. *Id.* at 951–53. The Supreme Court rejected this argument, citing Nebraska's efforts to limit the sale of groundwater within the state as proof that groundwater is an object of trade. *Id.* at 953–54 ("[The] claim that Nebraska ground water is not an article of commerce goes too far: it would not only exempt Nebraska ground water regulation from burden-on-commerce analysis, it would also curtail the affirmative power of Congress to implement its own policies concerning such regulation [of groundwater].").

Maryland Square's position in this case, that groundwater found within a state cannot be an article of interstate commerce, is the same as the position the Court rejected in *Sporhase*. Indeed, the Supreme Court emphasized that the federal government has a significant interest in groundwater because groundwater is found in multistate aquifers and facilitates irrigated farming that supplies markets worldwide. *Id.* at 953. Congress, by making the protection of groundwater and surface water a main priority of CERCLA, acted on that federal interest. *See* 42 U.S.C. §§ 9605(c)(2), 9618.

In addition, we deal with a dry cleaning establishment that created the contamination as part of its commercial operation, and resulted in clean up costs that burdened commerce. The clean up, as well as the business itself, substantially affect interstate commerce. Application of CERCLA is supported for those reasons as well. The Eleventh Circuit in *United States v. Olin Corporation*, 107 F.3d 1506 (11th Cir. 1997), recognized the economic burden of clean up costs in rejecting a challenge to CERCLA very similar to the one in this case. The chemical manufacturer in *Olin* contended that its on-site disposal of hazardous substances did not affect interstate

commerce because the substances never left the site. *Id.* at 1511. The court rejected that contention, stating that Congress, in passing CERCLA, recognized the growing economic costs of handling and disposing hazardous substances and that these costs were associated with both off-site and on-site disposal. *Id.* Also recognizing that hazardous substance clean up affects interstate commerce, the Second Circuit in *Freier v. Westinghouse Electric Corporation*, 303 F.3d 176 (2d Cir. 2002), rejected a Commerce Clause challenge to an amendment to CERCLA affecting the statute of limitations for claims resulting from exposure to hazardous substances. In upholding this amendment as an integral part of CERCLA's regulatory scheme, the court stated that the generation and disposal of waste in connection with the operation of a business are economic activities properly regulated under the Commerce Clause. *Id.* at 202.

The Supreme Court's decisions in *Lopez* and *Morrison* concerning non-economic activity are not relevant here, for the Court's holding in both depended upon the conclusion that the activities sought to be regulated were not commercial activities. *See Lopez*, 514 U.S. at 561 (the criminal statute prohibiting the knowing possession of a firearm in a school zone had "nothing do with 'commerce' or any sort of economic enterprise"); *Morrison*, 529 U.S. at 613 (gender-motivated violent crimes "are not . . . economic activity").

The Supreme Court has consistently held that Congress, under the Commerce Clause, can regulate commercial activities, even where the economic impact of the individual defendant's actions were far smaller than in this case, as with home cultivation of medical marijuana. *Gonzales v. Raich*, 545 U.S. 1, 26–27 (2005). The Court has made no de minimus exception. Courts will not "excise, as trivial,

individual instances" of a class of activities that is within the federal power. *Id.* (internal quotations and citations omitted).

## II.  Maryland Square Has Not Shown That It Qualifies for an Exception to CERCLA Liability, and It Is Clearly Responsible for Reimbursement Under Nevada State Law

Maryland Square contends that even if CERCLA may be constitutionally applied, Maryland Square nevertheless should not be liable because it qualifies as a bona fide prospective purchaser under CERCLA.  It also challenges its liability under the Nevada state law requiring the owners of a contaminated site and those responsible for the hazardous spill to reimburse the State after it cleans up the contamination.  We deal with each contention in turn.

### A.  Maryland Square Did Not Establish That It Qualifies as a Bona Fide Prospective Purchaser Under CERCLA

CERCLA is a strict liability statute in that it does not require a party to act culpably in order to be liable for clean up.  *Cal. Dept. of Toxic Substances Control v. Hearthside Residential Corp.*, 613 F.3d 910, 912 (9th Cir. 2010).  Our court has described the four elements that create liability. *3550 Stevens Creek Associates v. Barclays Bank of Cal.*, 915 F.2d 1355, 1358 (9th Cir. 1990).  A plaintiff must establish: (1) the site containing the hazardous substances is a facility under CERCLA; (2) a release or threatened release of a hazardous substance has occurred from that facility; (3) the plaintiff incurred response costs as a result of that release or threatened release and those costs were necessary and consistent with the national contingency plan; and (4) the

defendant is in one of the categories of entities subject to the liability provisions of CERCLA § 107(a).  *Id.*

Maryland Square does not contest the first three elements. The Site is a facility under CERCLA because hazardous substances were disposed there.  42 U.S.C. § 9601(9).  A hazardous substance was released when the operators spilled PCE down the drain, through the pipes and into the environment.  42 U.S.C. § 9601(22).  NDEP's response was necessary because no party had taken responsibility for the clean up.  42 U.S.C. § 9607(a).

Maryland Square contends it falls within 42 U.S.C. § 9607(r)(1), the bona fide prospective purchaser exception to liability.  This provision exempts from liability those who in good faith purchased a property they did not contaminate, but only provided they meet certain conditions.  It states that:

> a bona fide prospective purchaser whose potential liability for a release or threatened release is based solely on the purchaser's being considered to be an owner or operator of a facility shall not be liable as long as the bona fide prospective purchaser does not impede the performance of a response action or natural resource restoration.

*Id.*

The statute further provides, however, that a defendant must meet eight separate criteria to qualify as a bona fide prospective purchaser.  42 U.S.C. § 9601(40)(A)–(H).  An owner seeking to qualify as a bona fide prospective purchaser must establish, among other things, that it purchased the

property after the hazardous substances were spilled, 42 U.S.C. § 9601(40)(A), made all appropriate inquiries before it purchased the property, 42 U.S.C. § 9601(40)(B), provided all legally required notices about the hazardous substances, 42 U.S.C. § 9601(40)(C), and took steps to stop any ongoing spill, prevent future spills, and limit the exposure from past spills, 42 U.S.C. § 9601(40)(D).

Regulations further spell out the steps an owner must take to qualify. An owner seeking to establish that it made "all appropriate inquiries," for example, must show that the examination was performed by an environmental professional, as defined in 40 C.F.R. § 312.10, that particular kinds of information about the property, its history and its value were collected, 40 C.F.R. § 312.22, and that various sources were consulted, 40 C.F.R. § 312.30. All of these steps must be taken prior to the purchase, but no more than a year before the purchase date. 40 C.F.R. § 312.20. The owner, furthermore, must interview past owners and operators, search for environmental cleanup liens, review government records, inspect the property, and obtain a declaration by the environmental professional no more than 180 days before the purchase date. *Id.*

Maryland Square attempted to establish it satisfied these requirements by submitting the "Supplemental Affidavit" of Paul G. Roberts, Maryland Square's manager. The district court did not consider this submission because it was not notarized, and for that reason concluded that Maryland Square had failed to meet its burden.

The "affidavit" should have been notarized, but the district court did not give Maryland Square an opportunity to correct that deficiency. Nor did the court consider the

contents of the submission to determine whether they would have been sufficient if notarized. The parties on appeal assume the truth of the statements and address the merits of Maryland Square's contention that the facts stated would show it qualifies as a bona fide prospective purchaser.

Roberts's submission stated that the seller, Clark County School District, disclosed the PCE contamination during the sale negotiations and that Maryland Square then retained counsel and hired Entrix, Inc., an environmental consulting firm, to review and report on the NDEP files concerning the Site. After purchasing the Site, Maryland Square hired an environmental contractor to demolish the building. The submission does not indicate that Maryland Square took any remedial steps, such as removing the soil after demolishing the building, but says only that Maryland Square followed the progress of the previous owners in drafting and submitting plans to clean up the Site, and that Maryland Square had some (mainly undescribed) correspondence with NDEP.

The statements in the submission are insufficient to establish Maryland Square satisfied the requirements for bona fide prospective purchaser status. They do not establish Maryland Square met requirements of 42 U.S.C. § 9601(40)(D) to prevent further harm, because Maryland Square failed to limit human and environmental exposure to a contamination already present. The submission acknowledges Maryland Square purchased the Site with knowledge of the contamination, and subsequently demolished the building, an action that exposed the contaminated soil to the elements, but identifies no steps that it took to remove the contaminated soil or limit the spread of PCE. NDEP was then forced to remove the contaminated soil six years after the building was destroyed, thereby creating a

situation contemplated by Congress when enacting CERCLA—reimbursement of a government entity forced to clean up a site because the owner refused to take action. *See* 42 U.S.C. § 9607(a)(4)(A).

In addition, Maryland Square's submission does not discuss the numerous regulatory requirements for making appropriate inquiries. *See* 42 U.S.C. § 9601(40)(B); 40 C.F.R. §§ 312.10, 312.20 *et seq*. The submission, without providing necessary supporting information, merely states that Maryland Square retained Entrix, Inc. to review files and prepare a report. It does not indicate if Entrix employed a qualified environmental professional, the substance of the report, or any description of the assessment conducted. *See* 40 C.F.R. §§ 312.10, 312.20 *et seq*. Maryland Square's submission was woefully insufficient to establish it was a bona fide prospective purchaser within the meaning of CERCLA.

The district court, however, rejected the submission on the basis of its form rather than its substance, and did not give Maryland Square a chance to make any additional showing. We therefore vacate the district court's grant of summary judgment against Maryland Square so that it may have an opportunity to cure the formal and substantive deficiencies of its prior submission and establish that it has met the statutory and regulatory requirements to qualify as a bona fide prospective purchaser.

**B. Maryland Square is Liable to the State under Nevada Law Because It Owned the Property and Failed to Remove the Contaminated Soil**

Pursuant to Nevada law, Nevada has established an account from which it may spend money to respond to a hazardous spill, manage the clean up of a contaminated site, and remove the hazardous substance. Nev. Rev. Stat. § 459.537. Under the statute, money from the "Account for the Management of Hazardous Waste" may be spent to pay the costs of responding to a leak or spill if the person responsible did not promptly clean it up. *Id.* Once this money has been spent, the statute instructs NDEP to demand reimbursement from various people, including "any person . . . who owns or controls . . . the area used for the disposal of the waste, material or substance." *Id.* This must include the current owner.

Maryland Square, as the current owner, tries to maintain it is not responsible under the statute because it did not own the Site at the time of the PCE disposal. However, the state statute contains no exceptions, nor does it limit the reimbursement obligation to those responsible for the spill.

Maryland Square also challenges the grant of injunctive relief under Nevada Revised Statutes § 445A.695, on the ground that it was not responsible for any discharges of PCE. Under this statute, NDEP may seek an injunction "to prevent the continuance or occurrence of any act or practice which violates any provision of NRS 445A.300 to 445A.730 . . . ." *Id.* NDEP contends that Maryland Square violated Nev. Rev. Stat. § 445A.465, a state statute that encompasses not only discharges, but also the failure to clean up a spilled contaminant that may enter the State's waters. The statute

makes it unlawful to "[a]llow a pollutant discharged from a point source or fluids injected through a well to remain in a place where the pollutant or fluids could be carried into the waters of the State by any means."  Nev. Rev. Stat. § 445A.465(1)(d).  Maryland Square allowed PCE to remain in the soil for six years, and the PCE did enter the waters of the State.  The district court, therefore, correctly granted summary judgment on NDEP's claim for injunctive relief as well.

### III.    NDEP Was Entitled to Summary Judgment Against the Operator, SBIC, on the CERCLA and State Law Claims

NDEP sued SBIC under CERCLA because SBIC operated the dry cleaning facility and disposed of the PCE. Among the categories of entities that CERCLA holds liable are operators of a facility where there was a "disposal" of hazardous substances.  CERCLA liability may be assessed against "any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of."  42 U.S.C. § 9607(a)(2).  "Disposal" means the "discharge, . . . spilling, leaking, or placing of any solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters."  42 U.S.C. § 6903(3).  SBIC's principal challenge to its CERCLA liability is that it did not operate the facility "at the time of disposal" because it leaked the contaminant onto the floor, not into the natural environment.

SBIC does not dispute the facts. It operated the dry cleaning facility at the Site between 1969 and August 31, 1984. SBIC's lease agreement for the facility called for it to be built with a trench style "sewage drain adequate for [SBIC's] business." SBIC admits that it used PCE in its operations and that it regularly spilled PCE on the concrete floor, and once spilled roughly 100 gallons of PCE during a filter change in 1982.

SBIC argues that spilling PCE onto the floor, rather than directly onto the land or water, does not count as a "disposal." SBIC's argument, therefore, is that the statute must be interpreted to require a disposal directly into the groundwater or onto the land. This interpretation is contrary to the language of the statute. A "disposal" under the statute includes any discharge or spill of waste "into or on any land or water *so that* [the waste] *may* enter the environment . . . ." 42 U.S.C. § 6903(3) (emphasis added). Because the phrase "enter the environment" is qualified by the word "may" in the definition of "disposal," the statute cannot be interpreted to cover only spills that go directly and immediately into the groundwater. The statute contemplates that some spills may never enter the environment. The definition covers more than direct spills. SBIC's interpretation conflicts with our practice of construing CERCLA liberally to achieve the goals of cleaning up hazardous waste sites promptly and ensuring that the responsible parties pay the costs of the clean up. *Carson Harbor Vill., Ltd. v. Unocal Corp.*, 270 F.3d 863, 881 (9th Cir. 2001).

The only other courts to consider an interpretation like SBIC's requiring "disposal" to be directly onto the land or into the water have rejected it. *See Amland Props. Corp. v. Aluminum Co. of Am.*, 711 F. Supp. 784, 791–92 (D.N.J.

1989) (concluding that a disposal inside a plant was a disposal "on any land"); *Lincoln Properties, Ltd. v. Higgins*, No. S-91-760DFL/GGH, 1993 WL 217429, at *19–20 (E.D. Cal. Jan. 21, 1993) (stating that a release into the environment need not be direct). Their reasoning is sound. SBIC cites no contrary authority on point.

Because we conclude that NDEP has established SBIC's liability for past costs under CERCLA, NDEP is also entitled to a declaratory judgment for future costs. *City of Colton v. Am. Promotional Events, Inc.–W.*, 614 F.3d 998, 1007 (9th Cir. 2010). In *City of Colton*, we held that a plaintiff who establishes liability for past response costs under CERCLA is entitled to a declaratory judgment on liability for future costs. *Id.* (citing 42 U.S.C. § 9613(g)(2)).

SBIC also, and on a similar basis, challenges the district court's grant of summary judgment on NDEP's state law claim under Nev. Rev. Stat. § 445A.695, which authorizes injunctive relief to prevent the continuation or reoccurrence of other statutory violations. SBIC contends that it did not operate the facility at the time the PCE actually touched the soil or groundwater. This fact is not relevant. NDEP has charged that SBIC violated Nev. Rev. Stat. § 445A.465, which makes it unlawful to "[d]ischarge from any point source any pollutant into any waters of the State . . . ." Nev. Rev. Stat. § 445A.465(a), (d). A drain pipe is a point source. Nev. Rev. Stat. § 445A.395. SBIC spilled PCE into the drain of the facility. The PCE was thus discharged through the drains as the point sources. SBIC is therefore liable for the resulting contamination of the groundwater.

**IV.   The District Court Did Not Decide the Issue Raised By Maryland Square's Motion for Reconsideration, So Remand is Required to Determine Whether Maryland Square Has RCRA Liability for Exposing the Contamination to the Elements**

The homeowners sought an injunction under RCRA to require all of the owners of the Site, including Maryland Square, to clean up the contamination.  An entity may be held liable under RCRA if it is an active contributor to the contamination on the site.  Liability may be assessed against:

> any person . . . who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment.

42 U.S.C. § 6972(a)(1)(B).  Maryland Square's original position was the same as the other owners of the Site: ownership of the Site was insufficient to establish liability. The district court rejected the Site owners' contention and granted summary judgment for the homeowners.

Maryland Square then moved for rehearing and advanced a new theory.  It contended that it was in a different position from the other owners because it acquired the property after the dry cleaning facility had closed down.  The homeowners opposed the motion for rehearing on the ground that even if Maryland Square did not own the Site when the spills happened, Maryland Square's demolition of the building in 2006 exposed the contaminated soil, exacerbating the

problem and making Maryland Square a contributor.  The homeowners relied on the expert report that they had attached to their summary judgment reply and that explained the effects of the demolition.

The district court did not resolve this issue, however. Instead, the district court ruled that it was divested of jurisdiction to decide the motion for reconsideration when the other Site owners appealed the earlier order granting summary judgment on the merits of the owners' RCRA liability.  The court was incorrect because the earlier order determined only liability, not relief, and was not a final judgment.  Thus, the appeal was taken prematurely from an interlocutory order.  *See State of Cal., on Behalf of California Dep't of Toxic Substances Control v. Campbell*, 138 F.3d 772, 776–77 (9th Cir. 1998).  Because the district court effectively denied the motion on jurisdictional grounds, Maryland Square never had the opportunity to respond to the merits of the homeowners' alternative theory of liability.  We therefore reverse the district court's denial of Maryland Square's motion for reconsideration, and remand so the issue of Maryland Square's RCRA liability may be fully considered.

**V.  The District Court Erred in Entering an Injunction Against SBIC for Clean Up Responsibilities Under RCRA in the Absence of Any Request for Judgment on the Underlying Claim**

The district court granted summary judgment against the operator, SBIC, sua sponte, followed by a RCRA permanent injunction.  This was error, because the homeowner plaintiffs in the RCRA suit never moved for summary judgment against SBIC.

There are only two general situations where a district court may sua sponte enter summary judgment; neither applies to this case.  A district court may enter summary judgment against a party that has moved for summary judgment when the court determines the moving party cannot prove its case at trial.  *See Gospel Missions of Am. v. City of Los Angeles*, 328 F.3d 548, 553 (9th Cir. 2003); *Cool Fuel, Inc. v. Connett*, 685 F.2d 309, 311 (9th Cir. 1982).  Here, SBIC did not ask for summary judgment in the homeowners' RCRA case.  The second situation is when a Fed. R. Civ. P. 12(b)(6) motion is converted into a motion for summary judgment under Rule 56 by consideration of materials outside the pleadings.  Fed. R. Civ. P. 12(d).  That did not occur here either.

The homeowner plaintiffs in the action have not tried to defend the district court's sua sponte order that SBIC now appeals.  The defendant owners argue the result is fair since they are happy to have SBIC share their liability.  Such determinations of liability and injunctive remedy are appropriate only after a court has considered the positions of all the parties.  *Portsmouth Square Inc. v. S'holders Protective Comm.*, 770 F.2d 866, 869 (9th Cir. 1985).  Here, the district court's sua sponte orders were entered without such consideration and must be vacated.

## VI.    SBIC is Liable to the Previous Owners Under the Indemnification Provisions of the 1968 and 1982 Leases

Both of the lease agreements that SBIC reached with the Site owners contained indemnification provisions.  Under Nevada law, indemnification provisions are interpreted like any other contract provision, according to normal contract

rules. *George L. Brown Ins. v. Star Ins. Co.*, 237 P.3d 92, 96–97 (Nev. 2010). The 1968 indemnification provision covered all claims arising from SBIC's actions as operator of the business. It stated as follows:

> Lessee agrees to indemnify and save harmless lessor from and against all claims arising from any act, omission or negligence of lessee . . . or employees or arising from any accident, injury or damage whatsoever caused to any person, or to the property of any person during the demised term, in or about the demised premises . . . and will indemnify and hold harmless Lessor from and against all costs, expenses and liabilities incurred in or in connection with any such claim or proceeding brought thereon.

The provision covers the homeowners' claims for SBIC's spills. SBIC admitted that from time to time during its operation of the dry cleaning facility "a button trap would clog and amounts of PCE would spill onto the concrete floor." SBIC also stated that a spill of roughly 100 gallons of PCE occurred in 1982 during a filter change. The RCRA claims from the homeowners arose from these spills, and the Site's previous owners claim they are entitled to indemnity from SBIC pursuant to the lease.

SBIC contends it is not liable because the previous owners have not proved that the contamination of the soil and groundwater happened "during the demised term" of its lease. The basis for liability under the guaranty, however, is the RCRA claim that arose from conduct of SBIC's employees

during the lease.  Their PCE spills occurred during the lease term.

SBIC also contends that the 1982 lease terminated any liability it might have had from the 1968 lease.  The provision it points to in the 1982 lease stated in relevant part as follows:

> TRANSITION AND TERMINATION OF PRIOR LEASE – As has been aforestated herein, LANDLORD and TENANT have heretofore held and been in a Landlord-Tenant relationship, the same being under a lease dated April 29, 1968 and addendum thereto dated February 27, 1969.  With respect thereto, upon the commencement of the lease term hereunder, said prior lease, addendum, and any rights and obligations of the respective parties arising out of the same shall be deemed terminated as if said lease as amended had expired by its term, i.e., lapse of time . . . .

The 1982 lease terminated the provisions of the prior lease, but did not extinguish the obligations SBIC incurred during its term.

SBIC also challenges its liability under the 1982 lease. The indemnification provision in that lease covered all obligations that were the result of SBIC violating a law.  The provision read as follows:

> INDEMNIFICATION – TENANT hereby covenants to indemnify, save and hold LANDLORD and the leased property free,

> clear and harmless from each liability, loss, cost, charge, penalty, obligation, expense, attorney's fee, litigation, judgment, damage, claim or demand of any kind whatsoever in connection with, arising out of, or by reason of any violation of law, ordinance or regulation by TENANT or of any independent contractor, agent, or employee of TENANT while in, upon, about or in any way connected with the leased property or any portion thereof during the term of this Lease.

SBIC contends that a claim for relief under RCRA does not arise out of a "violation of law" within the meaning of the provision. RCRA, however, imposes liability for failure to clean up contamination, and one who has not paid has violated the law. SBIC thus must indemnify the owners for the obligations they incurred as a result of SBIC's RCRA violations.

## VII. The District Court Erred in Holding Melvin Shapiro Liable on His Personal Guaranty Because the Guaranty Operated Only Prospectively and There Was No Evidence of Spills Occurring After He Signed the Guaranty

Melvin Shapiro, a co-founder and officer of SBIC, signed a guaranty when SBIC transferred the dry cleaning business to DCI. Under Nevada law, guaranty agreements are interpreted according to general contract interpretation principles. *Dobron v. Bunch*, 215 P.3d 35, 37 (Nev. 2009). By signing the guaranty at issue in this case, Melvin Shapiro personally guaranteed that DCI would perform all of SBIC's

obligations, including the obligation to indemnify.  The personal guaranty at issue here read as follows:

> The undersigned, jointly and severally, unconditionally guarantees performance by Assignee of each and every one of the obligations of tenant under the lease herein assigned . . .

The date of the Assignment was August 31, 1984.  A guaranty agreement is prospective unless it expressly states otherwise. 38A C.J.S. Guaranty § 59; *Bank of Am. Nat. Trust & Sav. Ass'n v. Kelsey*, 44 P.2d 617, 619 (Cal. Ct. App. 1935) ("It is a rule of very general application that all guaranties are prospective and not retrospective in operation, unless the contrary appears by express words or by necessary implication.").  Because this principle has not been addressed by the Nevada Supreme Court, we must predict how the Nevada Supreme Court would rule. *Arizona Elec. Power Co-op., Inc. v. Berkeley*, 59 F.3d 988, 991 (9th Cir. 1995). Counsel for the previous owners commendably conceded at oral argument that such guarantees are generally only prospective.  There is no reason to believe that Nevada would deviate from this widely-recognized rule for interpreting a guaranty.

The previous owners did not identify any violation of the 1982 lease that occurred after the effective date of the Assignment.  The only spills the previous owners referenced were those that occurred during SBIC's operation of the facility.  Because the violations occurred before Melvin Shapiro signed the guaranty, and it did not apply retroactively, the judgment against him must be reversed.

## CONCLUSION

The district court properly rejected Maryland Square's constitutional challenge to the application of CERCLA in this case, and correctly granted judgment against Maryland Square and in favor of NDEP on its state law claims.

The district court's judgment in favor of NDEP and against SBIC on both the CERCLA and the state law claims must be affirmed. The judgment against SBIC on the claims of the prior Site owners for indemnity was in accordance with the provisions of the leases and must be affirmed.

The district court erred, however, in entering judgment against Maryland Square on NDEP's CERCLA claim without giving Maryland Square an opportunity to correct the deficiencies in its "bona fide prospective purchaser" submission. The district court also erred in denying for lack of jurisdiction Maryland Square's motion for reconsideration of the RCRA judgment, and we remand for consideration on the merits.

In the homeowners' RCRA action, the district court erred in entering judgment against SBIC sua sponte and the judgment, as well as the ensuing injunction, must be vacated.

Although the district court properly held that the prior Site owners were entitled to indemnification from SBIC, the court erred in holding Melvin Shapiro was individually liable for indemnification on the basis of his personal guaranty that operated only prospectively.

Our decision may be summarized with reference to each of the five appeals before us as follows:

The district court's judgment in favor of NDEP on the CERCLA and Nevada state law claims against SBIC is **AFFIRMED** (12-16409).

The district court's judgment against Maryland Square on the CERCLA claim is **REVERSED** and **REMANDED**. The judgment against Maryland Square on the Nevada state law claims is **AFFIRMED** (12-16412).

The RCRA judgment against Maryland Square is **REVERSED** and **REMANDED** with instructions to consider Maryland Square's motion for reconsideration (10-17520). The sua sponte entry of summary judgment against SBIC under RCRA is **VACATED** and **REMANDED**, and the permanent injunction entered under RCRA is **VACATED** as to SBIC (11-15174).

The judgment for indemnity against SBIC is **AFFIRMED**, and the judgment for indemnity against Melvin Shapiro is **REVERSED** and **REMANDED** with instructions to enter judgment in favor of Melvin Shapiro (11-15176).

**AFFIRMED** in part, **REVERSED** in part, **VACATED** in part, and **REMANDED** in part.

Costs are awarded to NDEP in No. 12-16409 and No. 12-16412, and to Melvin Shapiro in No. 11-15176. In Nos. 11-15174 and 10-17520, each party is to bear its own costs.